(Nos. 69697, 69698 cons.—

SYLVESTER ROLLINS, Appellee, v. JOHN S. ELLWOOD, Sergeant, Appellant.—SYLVESTER ROLLINS, Appellee, v. THE CITY OF BALTIMORE, MARYLAND, Appellant.

*Opinion filed November 30, 1990.*

John R. Myers and Michael Chimitris, of Bell, Boyd & Lloyd, of Chicago, Mark D. Bauman, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Belleville, and Otho M. Thompson, of Baltimore, Maryland, for appellants.

Thomas M. Daley and Amiel Cueto, of Cueto, Daley, Williams, Moore & Cueto, Ltd., of Belleville, for appellee.

JUSTICE STAMOS delivered the opinion of the court:

This appeal calls for this court to further consider the extent to which the courts of this State may exercise personal jurisdiction over nonresident defendants named in lawsuits filed by Illinois residents. Defendants are Sergeant John S. Ellwood (Ellwood) and the City of Baltimore, Maryland (Baltimore). They appeal from an order of the Appellate Court, Fifth District, that denied their petitions for leave to appeal from an order of the circuit court of St. Clair County, pursuant to Supreme Court Rule 306 (107 Ill. 2d R. 306); the circuit court order had denied the motions of both defendants to quash service of process on them for lack of personal jurisdiction. Defendants seek reversal of the appellate court's denial of their petitions for leave to appeal, and also request that we review the merits of their arguments regarding the circuit court's lack of personal jurisdiction over them and directly reverse the circuit court order (*Krasnow v. Bender* (1979), 78 Ill. 2d 42, 47 (in certain circumstances, concern for judicial economy allows supreme court, on appeal of appellate court's denial of leave to appeal, to rule on merits of cause)).

We have granted defendants' petitions for leave to appeal (107 Ill. 2d R. 315) and have consolidated the two cases for appeal. In our review of this case we have considered the facts as they bear on both the order of the appellate court and the order of the circuit court, and we have considered the parties' arguments on the issues. We now not only reverse the judgment of the appellate court which denied defendants leave to appeal to the appellate court, but also reverse the judgment of the circuit court which found that defendants are subject to that court's personal jurisdiction.

## FACTS

Plaintiff, Sylvester Rollins (Rollins), filed his original complaint in the circuit court on August 28, 1986, naming as defendants only Baltimore and the Illinois County of St. Clair. Since that time, plaintiff has amended his complaint three times naming additional defendants, including Ellwood, and adding a number of counts of wrongful conduct. As it stands today, plaintiff's complaint alleges that defendants Baltimore and Ellwood acted negligently and willfully and wantonly so as to deny him certain rights, and alleges that they committed the intentional torts of kidnapping, unlawful restraint, and conspiracy.

When Rollins was stopped for speeding by the East St. Louis police on July 9, 1986, a distressing month-long ordeal began for him, which is the basis of his complaint. In order to post bond, Rollins was brought to the East St. Louis police station; while he was there the police ran a check on him. The police discovered that an outstanding fugitive warrant existed for someone named "Ruchell Rollins," issued by the Baltimore police department. On July 10, after pleading guilty to the speeding charge, being fined, and being released on that charge, Rollins was re-arrested pursuant to a "hold order" en-

tered by the circuit court, which ordered that Rollins be held on the fugitive warrant; Rollins was then transferred to the St. Clair County jail to await further action on the Baltimore charge.

Not until Rollins was re-arrested did the East St. Louis police advise the Baltimore police department that they were holding Sylvester Rollins on the fugitive warrant naming Ruchell Rollins. East St. Louis officials contacted the central records division of the Baltimore police department to determine if Ruchell Rollins was known to use the alias "Sylvester"; the central records division responded that it had no such information. Nonetheless, the St. Clair County jail officials continued to hold Rollins. Apparently, what happened next was that an officer in the Baltimore police department's fugitive unit was made aware that St. Clair County officials were holding "Sylvester W Rollins aka Ruchell Rollins" and, unaware that there was some question as to whether Sylvester Rollins was the same person as Ruchell Rollins, the man named in the warrant, on July 11 authorized detainer of Rollins by St. Clair County officials. Later that day the same Baltimore police officer informed St. Clair County officials that the Baltimore State's Attorney had authorized extradition; he also asked to be notified when Rollins cleared local charges.

Meanwhile, on July 10, July 11, and the days that followed, Rollins repeatedly told St. Clair County officials that he was not the man named in the Baltimore warrant and that he had never even been in Baltimore. Yet, when he was brought before a judge of the circuit court of St. Clair County on July 11, Rollins signed a waiver of extradition form. The waiver form stated:

"I, SYLVESTER WAYNE ROLLINS, a/k/a Ruchell Rollins, now in custody and having been informed by the Judge before whom this waiver is executed that I am charged with the offense of SODOMY, SEXUAL CHILD

ACTS, & CHILD ABUSE, a crime in the State of MARYLAND, *** and I have been informed that a demand has been made for my return to the State of MARYLAND and that I have the right to procure counsel and the right to test my present detention by a Writ of Habeas Corpus and the right to demand the issuance and service of a warrant of extradition; but not withstanding I hereby freely and voluntarily waive the issuance and service of all extradition proceedings and consent to return (go) to the State of MARYLAND, accompanied by a peace officer thereof for the purpose of answering a criminal charge there pending against me."

The circuit court then ordered the officials of the St. Clair County jail to deliver Rollins to "the duly accredited agents of the State of MARYLAND" who would present themselves for the purpose of transporting Rollins to Maryland to appear on the charges.

For some reason, it was not until July 29, 1986, that St. Clair County jail officials informed the Baltimore police department that Rollins had cleared local charges, had waived extradition, and was ready to be given over to the Baltimore police. Sergeant Ellwood of the Baltimore police department's fugitive unit received this information and, with another police officer, travelled to Belleville, Illinois, on August 5, 1986, stayed overnight, and on the morning of August 6 took custody of Rollins. At some time during Rollins' and Ellwood's journey to Baltimore, Rollins told Ellwood and the other officer that he was not the man sought on the Baltimore charges and, in fact, had never been in Baltimore; whereas Rollins says he made these statements while in a car on the way to the airport, Ellwood and the other officer both recall that it was not until the airplane was already on its way to Baltimore that Rollins made such statements. Also, both Ellwood and the other officer have stated that, before this incident, they had never known of a case in which a person who signed a waiver

of extradition later denied being the person identified in the warrant. The day after his arrival in Baltimore, Rollins was brought before a judge who found that Rollins was, in fact, not the person identified in the Baltimore warrant. Rollins was then released.

This cause of action has not yet, after four years, advanced beyond the stage of determining personal jurisdiction over Ellwood and Baltimore. In response to Rollins' complaint, defendants Ellwood and Baltimore filed special and limited appearances in the circuit court of St. Clair County, seeking to have service of process upon them quashed for lack of personal jurisdiction (Ill. Rev. Stat. 1985, ch. 110, par. 2—301(a)). Rollins seeks to establish personal jurisdiction over both Ellwood and Baltimore, neither of them an Illinois resident, on the basis of Illinois' long-arm statute. The long-arm statute provides that "[a]ny person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person *** to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts ***." (Ill. Rev. Stat. 1985, ch. 110, par. 2—209(a).) Among the acts that serve to submit a person, and that person's principal, to the personal jurisdiction of the Illinois courts is "[t]he commission of a tortious act within this State." (Ill. Rev. Stat. 1985, ch. 110, par. 2—209(a)(2).) Rollins is thus attempting to assert personal jurisdiction over Ellwood on the basis of Ellwood's allegedly tortious acts in Illinois of restraining and transporting Rollins. Concerning Baltimore, Rollins contends that Ellwood committed these tortious acts in Illinois as Baltimore's agent insofar as Ellwood acted in his capacity as a Baltimore police department employee, and the Baltimore police department is an agent of the City of Baltimore.

Although neither Ellwood nor Baltimore disputes at this stage that Ellwood engaged in the specified conduct in Illinois, they have both denied that Ellwood's conduct properly subjects them to the personal jurisdiction of the circuit court. Ellwood argues that because his actions were taken on behalf of his employer, the Baltimore police department, he is protected from the circuit court's exercise of personal jurisdiction over him by the fiduciary shield doctrine: the fiduciary shield doctrine prevents courts from asserting jurisdiction over a person on the basis of acts taken by that person not on his own behalf, but on behalf of his employer. Baltimore argues that it is not subject to the circuit court's personal jurisdiction because the Baltimore police department is an agency of the State of Maryland, not an agency of Baltimore; therefore, when Ellwood took custody of Rollins in Illinois he did not act as an agent of Baltimore and Baltimore did not commit, through Ellwood as agent, the allegedly tortious acts in Illinois giving rise to this cause. In this opinion, we first address Baltimore's argument.

## ANALYSIS

### Whether Sergeant Ellwood Acted as an Agent of the City of Baltimore

Baltimore argues that it is not subject to the personal jurisdiction of the circuit court because the Baltimore police department is not an agent of Baltimore, and because Ellwood was not, and did not act as, an agent of Baltimore; thus, Baltimore has taken no action warranting its being required to defend the present action in Illinois.

Baltimore contends, on three separate grounds, that we should find that the law of Maryland, not the law of Illinois, controls the question whether an agency relationship existed between Baltimore and the Baltimore

police department; consequently, because Maryland law unequivocally holds that there is no agency relationship between the two entities, we should reverse the circuit court judgment and order the dismissal of Baltimore from this cause for lack of personal jurisdiction.

Baltimore first argues that the doctrine of judicial comity favors applying Maryland's law regarding this agency issue because as a law dealing with State power it deserves our respect and because this law does not conflict with any Illinois public policy.

Baltimore also argues that we should recognize and apply, on the basis of comity, Maryland law which provides that the process of detainer and extradition is solely within the power of the State and that those persons from the State having jurisdiction over the crime who receive a fugitive from officials of another State are in fact agents of the executive authority of their State. Recognizing Maryland law on this point, which establishes that Ellwood's actions in Illinois to effectuate the extradition of Rollins were performed as an agent of the State of Maryland, would also not violate any public policy of Illinois because Illinois law relating to detainer and extradition is identical in all pertinent respects to Maryland law.

If this court chooses not to exercise its power of judicial comity, and therefore uses a conflict-of-laws analysis to determine whether Maryland or Illinois law should apply to the issue of agency, Baltimore argues that a proper agency law conflict-of-laws analysis will result in application of Maryland law because Maryland has a more significant relationship to, and interest in, whether an agency relationship exists between Baltimore and the Baltimore police department; Baltimore argues that the circuit court improperly used a tort law conflict-of-laws analysis when deciding this agency question. In addition, Baltimore argues that even if Illinois law is applied no

agency relationship between Baltimore and the Baltimore police department should be found to exist.

The circuit court's finding that an agency relationship did exist, giving the court personal jurisdiction over Baltimore, rested on its conflict-of-laws analysis which employed the approach that this court has adopted for tort matters. (*Ingersoll v. Klein* (1970), 46 Ill. 2d 42.) The circuit court found that Illinois had the most significant relationship to the allegedly tortious conduct in the present case for the following reasons: the conduct and injury occurred in Illinois, the parties' relationship was centered in Illinois given that the tort occurred here, and Illinois has an interest in compensating its residents who are tort victims. Because Illinois has the most significant relationship to the tortious conduct, the circuit court applied Illinois law to the question whether an agency relationship existed. Illinois law provides that an agency relationship exists if one party has the right to control the actions of another. Next, the circuit court reviewed evidence showing that Baltimore contributed approximately 70% of the Baltimore police department's annual budget, Baltimore performed a variety of administrative tasks for the police department, and the mayor of Baltimore appoints the police commissioner. The court acknowledged that there was no evidence that Baltimore was able to control the police department's performance of the detainer and extradition process. Yet the court held that, because a plaintiff attempting to establish personal jurisdiction need only make a *prima facie* showing of jurisdiction and because all factual conflicts in the evidence and pleadings submitted are to be resolved in favor of the plaintiff (*Kutner v. DeMassa* (1981), 96 Ill. App. 3d 243), Rollins had established that an agency relationship existed between the Baltimore police department and Baltimore. Therefore, the court denied Balti-

more's motion to quash service for lack of personal jurisdiction.

The comity discussion of the parties and the circuit court largely revolves around our recent decision in *Schoeberlein v. Purdue University* (1989), 129 Ill. 2d 372. In *Schoeberlein* this court invoked the doctrine of judicial comity in deciding to recognize the sovereign immunity of the State of Indiana; as a result, the plaintiff's cause of action against the State of Indiana, which had been filed in the Illinois circuit court, was barred. This court defined comity as " '[t]he principle in accordance with which the courts of one state or jurisdiction will give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect.' (Black's Law Dictionary 334 (4th ed. 1951).)" (*Schoeberlein*, 129 Ill. 2d at 378.) Comity has been called a rule of practice, not a rule of law (Black's Law Dictionary 267 (6th ed. 1990)), for one State's law has no force beyond that State's boundaries unless another State chooses to recognize it (see *Dougherty v. American McKenna Process Co.* (1912), 255 Ill. 369, 371; see also *Clubb v. Clubb* (1949), 402 Ill. 390, 399-400 (where issue was whether Illinois chancery court could recognize divorce decree entered in England, court explained "[c]omity, in a legal sense, is neither matter of absolute obligation *** nor of mere courtesy and good will ***, but it is a recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to the international duty and convenience and to the rights of its own citizens who are under the protection of its laws")). One State will recognize and apply the law of another State in order to foster goodwill, cooperation, and respect between the States. But where the other State's law is contrary to the public policy of Illinois, this court will not recognize it on the basis of comity. See *Schoeberlein*, 129 Ill.

2d at 378-79; *Nelson v. Hix* (1988), 122 Ill. 2d 343, 352 (after applying conflict-of-laws analysis to issue whether Illinois or Ontario interspousal tort immunity law should be applied, court stated comity did not prevent application of Ontario law, for it was not contrary to public morals, natural justice, or general interest of Illinois citizens).

We found that recognizing Indiana's sovereign immunity was appropriate in *Schoeberlein* because Illinois' law of sovereign immunity was similar to Indiana's law: in both States the amount of any recovery was limited and the proper forum for a tort action against either State was the courts of that State. Looking at the decisions of the courts of other States on the issue whether a foreign State's sovereign immunity deserves recognition, we concluded in *Schoeberlein* that the answer depends upon whether a plaintiff in a like position who was suing the forum State would be allowed to do so under the law of the forum State. Because Illinois law restricted tort actions against the State of Illinois in a manner similar to Indiana law restrictions on tort actions against the State of Indiana, this court concluded that no Illinois public policy would be contravened by honoring Indiana's sovereign immunity and dismissing the cause of action for lack of jurisdiction by the Illinois circuit court. This court also explained that the aspirational goal that every person shall receive a remedy for his injuries, expressed in the Illinois Constitution (Ill. Const. 1970, art. I, §12), is not violated by limiting available remedies and requiring an Illinois citizen to seek a remedy in the proper forum. *Schoeberlein*, 129 Ill. 2d at 379-80.

*Schoeberlein* dealt solely with the question whether this court would honor the sovereign immunity of another State. The present case, by contrast, does not deal with the question whether the sovereign immunity of the State of Maryland should be recognized. Rather, the is-

sue here is whether we will recognize Maryland law which instructs that the Baltimore police department is a State agency and not an agency of Baltimore. The circuit court did not seem to understand this, for it discounted Baltimore's comity argument after reasoning that, while the State of Maryland would not be subject to the jurisdiction of the Illinois courts because of sovereign immunity (for, using the *Schoeberlein* analysis, Rollins could not sue the State of Illinois in the Illinois circuit court), because Baltimore is a municipal corporation and Illinois law does not immunize municipal corporations from suit, considerations of comity did not preclude the circuit court's exercise of jurisdiction over Baltimore. The circuit court seemingly ignored the question whether considerations of comity warranted recognition of Maryland law regarding the issue of agency, as distinct from sovereign immunity, particularly Maryland law's provision establishing that the police department is a State agency.

The issue in the present case is whether we will honor and implement the decision of the Maryland legislature to designate the Baltimore police department a State agency, and whether we will recognize the judgment of the highest court of Maryland that the Baltimore police department is indeed a State agency, is not an agency of Baltimore, and Baltimore has no power to control the police department's enforcement of the law. These narrower questions concern the fundamental power of a State to designate which governmental entities created under its aegis are its agencies and therefore subject to its direct control, and which are to be considered agencies of a local government.

We choose to recognize Maryland law on this issue and so find that, because neither Baltimore nor anyone acting as its agent committed any acts in Illinois regard-

ing the detainer and extradition of Rollins, the circuit court lacks personal jurisdiction over Baltimore.

Maryland statutory law provides that "[t]he Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland." (Code of Public Local Laws of Baltimore City art. 4, §16—2(a) (1980).) This has been the case since 1860, when the Maryland legislature first removed the Baltimore police from the control of the City of Baltimore and assumed control of the police itself, owing to perceived rampant corruption within the police department and its failure to keep the peace. In 1867, the Maryland legislature enacted a provision explicitly stating that the City of Baltimore is not to be held liable for the actions of the police department, given the City's lack of control over the police. See *City of Baltimore v. Silver* (1971), 263 Md. 439, 449, 283 A.2d 788, 793.

The highest court of Maryland, the Court of Appeals of Maryland, has "consistently held that Baltimore City should not be regarded as the employer of members of the Baltimore City Police Department for purposes of tort liability." (*Clea v. City of Baltimore* (1988), 312 Md. 662, 668, 541 A.2d 1303, 1306.) The fact that a local police department is designated a State agency is unique even in Maryland. (*Clea*, 312 Md. at 668, 541 A.2d at 1306.) Nonetheless, this was and has continued to be the decision of the Maryland legislature. Furthermore, an affidavit submitted by Baltimore in this cause states that most legislation affecting the police department is enacted by the Maryland legislature. See also *Clea*, 312 Md. at 669, 541 A.2d at 1306 ("General Assembly, and not the Baltimore City Council, has continued to be the legislative body enacting significant legislation governing the Baltimore City Police Department").

The Illinois General Assembly likewise has the power, which it exercises, to create and directly control State

agencies, and to allow local governments to control other governmental units. (Ill. Rev. Stat. 1985, ch. 127, par. 1003.01.) We have found no restriction on this power relevant to the present case in the Illinois Constitution, nor has such restriction been brought to our attention by the parties. Thus, this legislative power to designate State agencies, exercised by the Maryland legislature in regard to the Baltimore police department, is not foreign to Illinois' governmental structure and practices.

Rollins declares that Maryland law designating the police department a State agency is so strange, arising as it does out of concern for police corruption 130 years ago, and is so unfair, because it allows "them" (apparently meaning Baltimore officials) to come into Illinois and commit tortious conduct yet enjoy immunity from civil suit, that Maryland law does not deserve our respect and recognition. Regarding the latter point, Rollins has leapfrogged over the question of whether "they" did anything in Illinois—Baltimore did not act through Ellwood unless an agency relationship existed between Baltimore and the police department, and unless this is true Baltimore does not deserve Rollins' condemnation. Regarding the former point, the original motivation for passing this law, which we deem to be powerful, is of less concern to us in this case than are the current circumstances in which this law is enforced. Nor is the fact that the Illinois legislature does not exercise comparable control over any local police force particularly persuasive in determining whether this Maryland law should be honored and applied on the basis of comity.

We will not interfere with another State's ordering of its own State agencies and thus encroach on that State's fundamental governing power unless the effect in Illinois or on Illinois citizens is such that the public policy of Illinois is contravened. (See *Schoeberlein*, 129 Ill. 2d at 377.) In the present case, for example, Maryland's desig-

nation of the Baltimore police department as a State agency would have to impress us as being highly unreasonable and unfair because another governmental entity, Baltimore, actually exercises significant control over the police department yet by virtue of the law is protected from liability and, further, any attempted recovery from the State of Maryland for the police department's actions would be subject to the sovereign immunity protections accorded Maryland. But this is not the situation here, for the evidence, which it was Rollins' burden to present (*Kutner*, 96 Ill. App. 3d at 247), does not show that Baltimore exercised any control over the law enforcement activities of the police department. Consequently, even under Illinois agency law no agency relationship between Baltimore and the police department has been proved (see, *e.g.*, *Wargel v. First National Bank* (1984), 121 Ill. App. 3d 730, 736 ("[t]he test of agency is the existence of the right to control the method or manner of accomplishing a task by the alleged agent")); it is certainly not against the public policy of Illinois to honor Maryland law designating the police department a State agency for whose actions Baltimore is not liable.

The circuit court relied on the following facts when it held that, under the rule that all conflicts in the evidence be resolved in favor of the plaintiff (*Kutner*, 96 Ill. App. 3d at 247), Rollins had established a *prima facie* case of personal jurisdiction over Baltimore by means of an agency relationship: Baltimore provided 71% of the police department's budget during fiscal years 1986 and 1987; Baltimore employees issue payroll checks to, process medical claims of, and administer some tests to police officers; the mayor appoints the police commissioner to a six-year term with the approval of the Baltimore city council; and the police commissioner informs the mayor of any major problems affecting the police depart-

ment. Rollins has cited additional facts to establish Baltimore's right to control, and actual exercise of "considerable control" over, the police department: the Baltimore city council has the power to change the budget submitted by the police department; a civil service employee of Baltimore assists in developing criteria for police department employees; and any building construction contracts into which the police commissioner enters have to be within the budget approved by the city council.

Baltimore counters this evidence with other facts showing that it has no control over the police department's regular operation, its law enforcement responsibilities, and, especially, the procedures for extradition and detainer of fugitives. While the mayor of Baltimore appoints the police commissioner, the mayor has virtually no control over the police commissioner after that; moreover, the police commissioner can be removed from office by the mayor for cause only, meaning official misconduct, malfeasance, inefficiency, or incompetency. The charter of the City of Baltimore provides that "no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the power of the Police Commissioner." Maryland law places all management and rulemaking power for the police department in the hands of the police commissioner (for example, establishing all organizational subdivisions; establishing classifications and ranks among police officers; promoting, demoting, reassigning or discharging police officers; regulating training, discipline, and procedure for all members of the department; making all necessary rules governing the department; and entering into all contracts necessary). (Code of Public Local Laws of Baltimore City art. 4, §16—5(e) (1980 & Supp. 1989).) Finally, Baltimore has submitted an affidavit of the associate solicitor of Baltimore stating that the mayor and city council are not responsible for executing or enforcing

procedures for detainer or extradition, do not interfere in these matters, do not know or have reason to know of the daily activities of the police department, and did not know or have reason to know of the activities giving rise to the present case until the complaint was filed.

Looking at this evidence, it is clear that Rollins has failed to present any evidence establishing that Baltimore exercises control over, or has the right to exercise control over, the police department's performance of law enforcement activities, especially in the area of detainer and extradition of out-of-State fugitives. Baltimore's contribution of approximately 70% of the police department's budget, performance of certain administrative tasks for the police department, such as administering civil service tests and issuing paychecks, and the mayor's appointment of the police commissioner simply fail to establish that Baltimore has a right to control any of the practices, procedures, or law enforcement operations of the police department. Because Baltimore does not have any right or power to control the law enforcement operations of the police department, recognizing Maryland law that the police department is a State agency and Baltimore is not generally liable in tort for the police department's actions does not impinge on the public policy of Illinois.

Furthermore, as we said in *Schoeberlein*, the fact that Illinois has an interest in seeing that its citizens are compensated for injuries wrongfully inflicted upon them does not mean that an Illinois plaintiff can compel a nonresident who is not responsible for those injuries to defend an action in an Illinois forum. Rollins may still seek a remedy in our courts against St. Clair County; and, if Rollins had proceeded correctly, there was no obstacle to his naming the State of Maryland as a defendant in a suit filed in Maryland State courts. See Md. State Gov't Code Ann. §§12—101 through 12—110 (1990).

For these reasons, we find that applying Maryland law that the Baltimore police department is an agency of the State of Maryland, for whose actions Baltimore is not liable because Baltimore lacks all significant control over the method by which the police department enforces the law, does not violate any public policy of the State of Illinois and is appropriate in the present cause.

Also meriting discussion is Baltimore's argument that, also on the basis of comity, we should recognize that Ellwood acted as an agent of the State and Governor of Maryland because under both Illinois and Maryland law one who assumes custody of a fugitive who has been detained by one State acts as an agent of the executive authority of the State requesting detainer and extradition of that fugitive. Baltimore asserts that the likeness of Illinois and Maryland law, in identifying the person who receives a fugitive as being an agent of the executive authority of the State requesting the fugitive's return, evidences that no Illinois public policy would be violated if this court should choose to recognize Maryland law on this point; therefore, this court should do so, should reverse the circuit and appellate court orders pertaining to Baltimore, and should direct the dismissal of Baltimore from this cause because Ellwood acted as an agent of the State of Maryland, not of Baltimore, when he effectuated the extradition of Rollins.

Illinois and Baltimore are indeed alike in providing that one who accepts custody of a fugitive from the authorities of the detaining State acts as an agent of, and has to present the authorization of, the executive authority of the requesting State. In fact, because both Illinois and Maryland have adopted the Uniform Criminal Extradition Act, as have the vast majority of the States, their statutes addressing the subject of the extradition of fugitives to and from their jurisdictions are virtually identi-

cal. See Ill. Rev. Stat. 1985, ch. 60, pars. 18 through 49; Md. Ann. Code art. 41, §§2–201 through 2–228 (1990).

The law of both Illinois and Maryland provides that "[w]henever the Governor of this State shall demand a person charged with crime *** from the Executive Authority of any other state *** he shall issue a warrant under the seal of this State, to some agent, commanding him to receive the person so charged if delivered to him" and deliver that person to the proper officer of the county where the offense was committed. (Ill. Rev. Stat. 1985, ch. 60, par. 39; Md. Ann. Code art. 41, §2–222 (1990).) On the other hand, the law of both Illinois and Maryland provides that, if the Governor of the State receives a demand for extradition of a fugitive from the Governor of another State, and the Governor decides to comply with the demand, the Governor shall issue a warrant for the arrest of the fugitive and upon arrest shall "deliver the accused *** to the duly authorized agent of the demanding state." Ill. Rev. Stat. 1985, ch. 60, par. 25; Md. Ann. Code art. 41, §2–208 (1990); see also Ill. Rev. Stat. 1985, ch. 60, par. 27 (no person arrested pursuant to extradition demand to be "delivered over to the agent whom the Executive Authority demanding him shall have appointed to receive him unless" certain procedures first followed); Md. Ann. Code art. 41, §2–210 (1990) (same).

The only response that Rollins has made to Baltimore's argument regarding the similarity of extradition law in Illinois and Maryland is to state that because he had signed a waiver of extradition, it "became incumbent upon the City of Baltimore Police Department to verify that plaintiff was the individual subject to the Maryland warrant"; the "fact that extradition is ordinarily a power of the states is not significant in this case because plaintiff waived extradition." But Rollins has presented no support for these assertions, and we do not

find any support in Illinois or Maryland law for the proposition that, if a person arrested as a fugitive waives extradition, an employee of a local law enforcement agency who is acting as an agent of the demanding State has an obligation in the capacity of an employee of the local agency, not in the capacity of a State agent, to verify the identity of the person who signed the waiver. On the contrary, Illinois and Maryland law provides that if such a person signs a waiver of extradition, a "judge shall direct the officer having such person in custody to deliver forthwith such person to the duly accredited agent or agents of the demanding state." Ill. Rev. Stat. 1985, ch. 60, par. 43; Md. Ann. Code art. 41, §2—224 (1990).

The laws of Illinois and Maryland are also in complete agreement regarding the procedures for detainer and the fact that a request for detainer has to issue from the executive authority of a State. Ill. Rev. Stat. 1985, ch. 38, pars. 1003—8—9, 1003—8—9(V)(b)(1) (codifying Interstate Agreement on Detainers); Md. Ann. Code art. 27, §§616A through 616R, 616F (1987) (same).

We will apply Maryland law on this point, and so on this ground we find that Ellwood's actions in this cause were undertaken as an agent of the State of Maryland, not as an agent of Baltimore. Our finding, however, is not motivated merely by comity and respect for Maryland law, because we are bound by Federal law to recognize that only the executive authority of a State has the power to demand, and to comply with a demand, that another State extradite a fugitive. This rule originates in the United States Constitution, which declares: "A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime." (U.S. Const., art. IV, §2, cl. 2.) This constitutional man-

date is implemented by Federal statute, which provides in part that the executive authority of the State where the fugitive is located shall "notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear." 18 U.S.C. §3182 (1982).

Federal law thus imposes a mandatory obligation upon all States to deliver, upon demand by a sister State, a fugitive within their borders. As the Supreme Court has explained, section 3182 of the United States Code "articulated, in mandatory language, the concepts of comity and full faith and credit, found in" the extradition clause of article IV of the Constitution. (*Michigan v. Doran* (1978), 439 U.S. 282, 287-88, 58 L. Ed. 2d 521, 526-27, 99 S. Ct. 530, 534-35.) We also have recognized that Federal law controls the subject matter of extradition, and while State law may detail the procedures to be followed during extradition, State law is void if it conflicts with the intent and meaning of Federal extradition law. *People ex rel. Hackler v. Lohman* (1959), 17 Ill. 2d 78, 84-85.

Federal law clearly provides that only an authorized agent of one State may receive custody of a person, who is allegedly a fugitive from that State, from the authorities of another State which has detained that person. Clearly, any finding that an authorized agent of the demanding State was in fact not an agent of that State but was an agent of a municipality within that State would conflict with Federal extradition law.

Because the law of Illinois and Maryland, and binding Federal law, agree that a person who accepts custody of a fugitive from the authorities of a State which has detained the fugitive is, and is required to be, an agent of the executive authority of the State requesting extradition, and because it is not disputed that Ellwood had the

proper authority from the governor of Maryland to accept custody of Rollins in Illinois and transport him to Maryland, we find that Ellwood acted as an agent of the State and not as an agent of Baltimore.

In summary, the circuit court of St. Clair County lacks personal jurisdiction over Baltimore and Baltimore is to be dismissed from this cause of action; the reasons are that the Baltimore police department is not an agency of Baltimore, and Ellwood, in effecting the extradition of Rollins from Illinois to Maryland, acted as an agent of the State of Maryland.

### Whether the Fiduciary Shield Doctrine Deprives the Circuit Court of Personal Jurisdiction Over Sergeant Ellwood

In considering Ellwood's position that the circuit court erroneously denied his motion to dismiss for lack of personal jurisdiction, we are faced with the issue whether we will recognize the fiduciary shield doctrine as a part of Illinois law.

In its order denying Ellwood's motion to quash service of process for lack of personal jurisdiction, the circuit court indicated that it did not think that the fiduciary shield doctrine was established in Illinois; rather, those appellate court opinions referring to the concept that an employee's conduct solely on behalf of an employer cannot be invoked to assert personal jurisdiction over the employee did so only in *dicta*, and based their holdings that the defendants were not subject to personal jurisdiction either on the fact that, no matter to whom a defendant employee's conduct could be attributed, the employee's conduct did not amount to the commission of a tortious act in Illinois (*Olinski v. Duce* (1987), 155 Ill. App. 3d 441), or on the fact that the plaintiff's cause of action did not arise out of the defendant employee's alleged contacts with Illinois (*Hurletron*

*Whittier, Inc. v. Barda* (1980), 82 Ill. App. 3d 443; *Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.* (1978), 66 Ill. App. 3d 789). Without taking a definite stand on whether the fiduciary shield doctrine was valid in Illinois, however, the circuit court went on to comment that "[s]ome courts refuse to apply the fiduciary shield rule when the employee himself has allegedly committed a tort"; the reason is that those courts consider it to be unfair to allow an employee to evade personal jurisdiction in a tort action when that employee is personally liable for his tortious conduct, even if the tortious conduct was performed on behalf of an employer. (*Club Assistance Program, Inc. v. Zukerman* (N.D. Ill. 1984), 594 F. Supp. 341; *Oxmans' Erwin Meat Co. v. Blacketer* (1979), 86 Wis. 2d 683, 273 N.W.2d 285.) The circuit court concluded by explaining that because Ellwood's contacts with Illinois gave rise to Rollins' cause of action, circumstances which did not exist in those cases which had alluded to the fiduciary shield doctrine (and which circumstances the circuit court seemed to think were prerequisites for application of the doctrine), it would not apply the fiduciary shield doctrine and would not quash service of process on Ellwood. By favorably discussing those decisions that recognize a tort exception to the doctrine, the circuit court also suggested that an additional reason for not applying the doctrine was that Rollins had alleged that Ellwood had committed torts in Illinois.

Ellwood requests that we recognize the validity of the fiduciary shield doctrine in Illinois law and declare that there is no tort exception to the doctrine; in the alternative, if we do recognize the tort exception discussed by the circuit court, Ellwood asks that we find that his conduct was not tortious because Ellwood was not involved in the decision to detain and extradite Rollins, and because Rollins consented to being taken into custody by

Ellwood and transported to Baltimore when Rollins signed the waiver of extradition form. Lastly, Ellwood argues that asserting personal jurisdiction over him, even if appropriate under Illinois' long-arm statute, violated the traditional notions of fair play and substantial justice that underlie the Federal guarantee of due process.

Rollins, on the other hand, largely adopts the reasoning of the circuit court, leading him to make the odd assertion that "the fiduciary shield doctrine is limited to cases in which the defendant employee had no personal contact with Illinois or where his contacts with Illinois had no relationship to the claims made against him"; we consider this assertion to be odd because these are circumstances under which personal jurisdiction can never be asserted over a defendant, regardless of whether or not the defendant was acting in a representative capacity for an employer. More reasonably, Rollins argues for application to this case of the tort exception to the doctrine, with the effect that an employee who commits a tort in Illinois would be subject to personal jurisdiction even if he was acting solely on his employer's behalf at the time. Rollins further argues that the fiduciary shield doctrine is to be applied in the discretion of the court (*Washburn v. Becker* (1989), 186 Ill. App. 3d 629), and where applying the doctrine will deprive an Illinois resident of a remedy in Illinois for improper acts committed in Illinois, as here, the effect is inequitable and a court should decline to apply the doctrine.

Contrary to the opinion of the circuit court, we think that the Illinois appellate court has recognized the fiduciary shield doctrine. We hereby recognize the doctrine also. The effect is to limit the jurisdictional power of the Illinois courts. Our holding rests upon our view of the extent to which Illinois' long-arm statute allows Illinois courts to exercise personal jurisdiction over nonresident

defendants and on our view of the scope of the due process clause of the Illinois Constitution (Ill. Const. 1970, art. I, §2). To explain our decision, we have to discuss our past rulings regarding the proper interpretation of Illinois' long-arm statute and discuss the evolution of Federal due process restraints on the power of State courts to exercise jurisdiction over nonresidents.

This court has explained that Illinois' long-arm statute is to be given a definite meaning and scope which does not fluctuate with every new pronouncement on the limits of Federal due process. (*Green v. Advance Ross Electronics Corp.* (1981), 86 Ill. 2d 431, 436.) The Supreme Court has held that if a nonresident is not served with process within the territory of the forum State, the courts of the forum State may not assert personal jurisdiction over the nonresident, consistent with the Federal guarantee of due process (U.S. Const., amend. XIV), unless the nonresident has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " (*International Shoe Co. v. Washington* (1945), 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158, quoting *Milliken v. Meyer* (1940), 311 U.S. 457, 463, 85 L. Ed. 278, 283, 61 S. Ct. 339, 343.) But these standards of Federal due process delineate "the outer limits beyond which a State may not go to acquire jurisdiction over nonresidents." (*Cook Associates, Inc. v. Lexington United Corp.* (1981), 87 Ill. 2d 190, 197.) In Illinois, the courts are to decide whether jurisdiction can properly be exercised by "looking to the meaning" of Illinois' long-arm statute, as well as separately inquiring into whether exercising jurisdiction is permissible under Federal due process standards. (*R.W. Sawant & Co. v. Allied Programs Corp.* (1986), 111 Ill. 2d 304, 311; *Green*, 86 Ill. 2d at 436-37.) Illinois' long-arm statute, therefore, may well restrict the power that the courts of this State have

to bring nonresidents before them to a greater extent than do the Federal due process clause and the "minimum contacts" standard developed over the years by the Supreme Court. As a result, our interpretation of Illinois' long-arm statute does not depend upon the Supreme Court's guidance regarding when, for Federal constitutional purposes, sufficient minimum contacts exist among a nonresident defendant, a forum, and the current litigation so as to warrant the forum's assertion of personal jurisdiction over the nonresident defendant. See *Cook Associates, Inc.*, 87 Ill. 2d at 201.

Aware that the scope of Illinois' long-arm statute may not be co-extensive with the jurisdictional aspect of the Federal due process clause in any particular situation, we note that the Supreme Court has recently indicated that Federal due process considerations do not compel a court to decline jurisdiction over a person whose conduct in, and connection with, a forum were engendered solely by his employment and not for any personal interests, at least when that person's conduct is allegedly tortious and engaged in with knowledge that effects will be felt in the forum State. The Supreme Court explained that, while an employee cannot be subject to the personal jurisdiction of a State court on the basis of an employer's contacts with that State, if the employee is a "primary participant[ ] in an alleged wrongdoing intentionally directed at a *** resident [of the forum State], *** jurisdiction over [the employee] is proper on that basis" and does not violate the due process clause of the fourteenth amendment. (*Calder v. Jones* (1984), 465 U.S. 783, 790, 79 L. Ed. 2d 804, 813, 104 S. Ct. 1482, 1487.) The defendant employees in *Calder* had engaged in just such intentionally directed wrongdoing—defendants were the author and editor of an article that had appeared in a publication which had been distributed nationwide, including in the forum State where plaintiff resided and

where her career was based, and thus defendants could "reasonably anticipate being haled into court" in the forum of plaintiff's residence to defend the truth of statements in the article, which had as its focal point the forum State, given that the brunt of any harm the plaintiff would suffer as a result of those statements would be felt by the plaintiff in the State where she resided and had based her career. (*Calder*, 465 U.S. at 788-90, 79 L. Ed. 2d at 812, 104 S. Ct. at 1486-87.) The Supreme Court contrasted this type of employee conduct with the conduct of a welder who aids in the manufacture of a product which is then distributed to various States, and who therefore engages merely in "untargeted negligence." *Calder*, 465 U.S. at 789, 79 L. Ed. 2d at 812, 104 S. Ct. at 1487.

While the Supreme Court may in the future clarify its holding in *Calder* so as to limit its scope to only those employees, such as newspaper reporters, who have some discretion as to who will be affected by the conduct in which they engage within the scope of their employment and as to where those effects will be felt, at this point we conclude that the holding in *Calder* establishes that Ellwood has the necessary minimum contacts with Illinois, by virtue of his intentional and allegedly tortious conduct in Illinois, so that Federal due process does not preclude Illinois courts from exercising personal jurisdiction over him. We note that in *Calder*, unlike the present case, the nonresident defendant employees did not even enter the forum State in connection with the allegedly tortious conduct; nonetheless, the Supreme Court found that because the defendants had directed their actions to have an effect in the forum, the forum could exercise personal jurisdiction over them. We now consider whether the scope of Illinois' long-arm statute and due process clause is more restricted, precluding such an exercise of jurisdiction over nonresident employees.

The long-arm provision that an individual "who in person" commits "a tortious act within this State" thereby submits himself to the jurisdiction of the Illinois courts would seem to authorize the circuit court's exercise of jurisdiction over Ellwood in this case. At this stage of his argument, Ellwood does not dispute that he committed a tortious act in Illinois. Moreover, in the cases in which this court has declared that it is necessary to construe the provisions of the long-arm statute independently of Federal due process concepts, and then held that the long-arm statute did not extend jurisdiction over the nonresident, the basis for that holding was that the nonresident's conduct did not fall under the definition of "a tortious act" or "the transaction of business." See *Cook Associates, Inc.*, 87 Ill. 2d at 198-203 (nonresident defendant did not transact any business in Illinois giving rise to cause of action, nor was it "doing business" in Illinois); *Green*, 86 Ill. 2d at 438 (diminution of corporate assets in Illinois as result of conduct elsewhere is consequence too remote to consider Illinois situs of tortious act); see also *R.W. Sawant & Co.*, 111 Ill. 2d at 311-12 (nonresident defendant's activities did not take place in Illinois).

We now wish to dispel any suggestion which might inhere in these cases that, once a court finds a nonresident defendant has committed acts that fall within the definition of a tortious act or a transaction of business in Illinois (or any other acts specified by the long-arm statute), Illinois' jurisdictional standards are satisfied and all that remains is for the court to determine if exercising jurisdiction comports with Federal due process standards. Our jurisdictional considerations under State law are not limited to analyzing whether a nonresident's conduct can be characterized by one of these literal textual descriptions.

The Illinois Constitution contains its own guarantee of due process to all persons (Ill. Const. 1970, art. I, §2), a guarantee which stands separate and independent from the Federal guarantee of due process. While this court may, in construing the Illinois Constitution's guarantee of due process, look for guidance and inspiration to constructions of the Federal due process clause by the Federal courts, the final conclusions on how the due process guarantee of the Illinois Constitution should be construed are for this court to draw.

Consequently, when we, as in the present case, consider whether the Illinois courts can assert personal jurisdiction over a nonresident defendant by means of the long-arm statute, we will consider not only the literal meaning of the text of that statute, and not only the evolving standards of the United States Constitution's guarantee of due process, but also the constraints imposed on jurisdiction by the Illinois Constitution's guarantee of due process. Jurisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois. See *People ex rel. Mangold v. Flieger* (1985), 106 Ill. 2d 546, 550.

With this concern for fairness uppermost in our mind, we address the fiduciary shield doctrine and the arguments of the parties in the present case. Ellwood argues in favor of our adoption of the fiduciary shield doctrine, which has already been recognized and applied repeatedly by the appellate court, as well as by the United States District Court for the Northern District of Illinois. (See *Washburn v. Becker* (1989), 186 Ill. App. 3d 629; *Olinski v. Duce* (1987), 155 Ill. App. 3d 441; *Financial Management Services, Inc. v. Sibilsky & Sibilsky, Inc.* (1985), 130 Ill. App. 3d 826; *Hurletron Whittier,*

*Inc. v. Barda* (1980), 82 Ill. App. 3d 443; *Continental Illinois National Bank & Trust Co. v. Premier Systems, Inc.* (N.D. Ill. Mar. 14, 1989), No. 88—C—7703; *Riga International Corp. v. Alpern* (N.D. Ill. Dec. 21, 1987), No. 87—C—3422; *Kula v. J.K. Schofield & Co.* (N.D. Ill. 1987), 668 F. Supp. 1126; *Club Assistance Program, Inc. v. Zukerman* (N.D. Ill. 1984), 594 F. Supp. 341; *State Security Insurance Co. v. Frank B. Hall & Co.* (N.D. Ill. 1981), 530 F. Supp. 94.) Initially, we find, contrary to the suggestion of the circuit court here, that the appellate court has established the fiduciary shield doctrine in Illinois law and has not merely referred to the doctrine in *dicta*.

The fiduciary shield doctrine was firmly established in *Hurletron Whittier, Inc.*, where the court declared, as partial basis for its holding, that "[t]he existence of personal jurisdiction must be established by acts of the defendant; however, the conduct of a person in a representative capacity cannot be relied upon to exercise individual personal jurisdiction over that person." (*Hurletron Whittier, Inc.*, 82 Ill. App. 3d at 447.) The court then declined to exercise jurisdiction over the nonresident defendant whose conduct in Illinois had been performed solely as a corporate representative, not for his personal benefit. (*Hurletron Whittier, Inc.*, 82 Ill. App. 3d at 448.) The fact that the court could have found the absence of jurisdiction based on separate grounds alone does not alter the court's reliance on the doctrine and obvious intention to recognize it. (See also *Washburn*, 186 Ill. App. 3d at 632 (recognizing existence of fiduciary shield doctrine in Illinois law); *Financial Management Services, Inc.*, 130 Ill. App. 3d at 831 (same).) Nor does Rollins dispute the validity of the fiduciary shield doctrine in general, though his understanding of its applicability seems a bit muddled; rather, Rollins argues that courts have discretion in applying the doctrine and

that the doctrine does not apply when the employee's conduct in Illinois amounts to a tort.

Despite the weight of authority approving application of the fiduciary shield doctrine in Illinois, we will not uncritically adopt the holdings of these courts regarding the validity of the doctrine in Illinois. In order for this court to recognize the doctrine, we have to find a reasonable basis for it in our long-arm statute and in the public policy and fairness considerations permeating the exercise by Illinois courts of jurisdictional power over nonresidents.

When we look to the decisions of those courts that have recognized the doctrine, we find, significantly, that where those courts have attempted to explain the authority upon which they have based their recognition of the doctrine, they have identified this authority as being the Federal due process clause as interpreted by the Supreme Court.

In *Hurletron Whittier, Inc.*, the court explained that an individual's acts undertaken as a representative of his corporate employer did not serve to confer jurisdiction over the individual, "for these acts in no way invoked the protection of Illinois law for the benefit of the defendant," and cited as authority the Supreme Court case of *Hanson v. Denckla* (1958), 357 U.S. 235, 2 L. Ed. 2d 1283, 78 S. Ct. 1228. *Hanson* elaborates on the due process requirement that a nonresident defendant have "minimum contacts" with the forum State, explaining that the defendant's activity in the forum has to be such that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson*, 357 U.S. at 253, 2 L. Ed. 2d at 1298, 78 S. Ct. at 1240.

The basis for the holding in *Washburn* was more obscure; in that case, the court found the rationale for the

fiduciary shield doctrine in a Federal district court opinion from the Northern District of Illinois (*State Security Insurance Co.*, 530 F. Supp. at 97), which had quoted a Second Circuit Court of Appeals opinion (*Marine Midland Bank v. Miller* (2d Cir. 1981), 664 F.2d 899, 902) interpreting New York's long-arm statute, which is basically identical to Illinois' statute. The rationale for the doctrine, *Washburn* quoted, is that " ' "it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." ' " (*Washburn,* 186 Ill. App. 3d at 632 (quoting *State Security Insurance Co.,* 530 F. Supp. at 97, which quoted *Marine Midland Bank,* 664 F.2d at 902).) Though the court in *State Security Insurance Co.* explained that it, like the court in *Marine Midland Bank,* was basing its recognition of the doctrine in the name of fairness on a judicial construction of the applicable long-arm statute, there was no reasoned analysis of the statute to justify this claim of authority; furthermore, a close reading of both Federal cases leaves the impression that the basis for those courts' recognition of the fiduciary shield doctrine was Federal due process standards. Because the *Washburn* court provided no analysis why the fiduciary shield doctrine should be recognized in Illinois beyond its quotation of these two Federal cases, its holding relied derivatively on Federal due process, not on legal principles of Illinois law.

This lack of clarity in the analysis of these courts does not assist us in finding a reasonable legal basis outside of Federal due process analysis for recognizing the fiduciary shield doctrine. Additionally, the previously cited Federal cases from the Northern District of Illinois, which provide us no binding guidance anyway when it comes to interpreting Illinois law, merely recognized that the fiduciary shield doctrine was an established part

of Illinois law without analyzing the authority for the doctrine. See, *e.g.*, *Continental Illinois National Bank & Trust Co. v. Premier Systems, Inc.* (N.D. Ill. Mar. 14, 1989), No. 88–C–7703, slip op. at 5.

Therefore, our review of decisions by courts that have recognized the validity of the fiduciary shield doctrine when deciding whether the long-arm statute authorizes the assertion of personal jurisdiction over a nonresident defendant shows that, when those courts attempted to identify the basis for their findings, they did not actually rely on any true construction of the specific provisions of Illinois' long-arm statute; instead, they relied on the breadth of jurisdictional power accorded to the States by the Supreme Court's pronouncements on the protection extended to a nonresident defendant by the Federal due process clause. Over the years, these pronouncements have broadened State courts' jurisdictional power over nonresidents, and narrowed the understanding of the due process accorded to nonresident defendants by the fourteenth amendment. Furthermore, as a consequence of the Supreme Court's 1984 decision in *Calder*, to the extent the appellate court has relied on the traditional notions of fair play and substantial justice defining Federal due process as support for its recognition of the fiduciary shield doctrine, the appellate court's decisions now to an even greater extent lack reasoned support.

We find that it is not fair, just, and reasonable for the Illinois courts to assert personal jurisdiction over one in Ellwood's situation. Ellwood entered into Illinois, and while in Illinois engaged in conduct giving rise to the present cause of action, solely in his capacity as a police officer acting for the Baltimore police department and the State of Maryland. The nature and quality of his actions in Illinois were defined and characterized by his status as a police officer employed by these entities. Be-

cause Ellwood's conduct in Illinois was a product of, and was motivated by, his employment situation and not his personal interests, we conclude that it would be unfair to use this conduct to assert personal jurisdiction over him as an individual. Also, we are not persuaded by the argument, raised by various sources, that asserting personal jurisdiction over an employee who acted in the scope of his employment is justified because the employee is serving his own financial interests when he performs the tasks imposed upon him by his employer. In practical terms, an employee, especially one in Ellwood's position, has little or no alternative besides unemployment when ordered to enter another State to carry out the wishes of his employer. Additionally, we see no reason to fashion an exception to the fiduciary shield doctrine that will expose employees who engage in tortious conduct within the scope of their employment to the personal jurisdiction of Illinois courts.

Thus, we find it to be unfair and unreasonable, under Illinois' due process clause and the tenets of our concept of the jurisdictional power of the Illinois courts, to assert personal jurisdiction over an individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal. We decline to define our courts' jurisdictional power so broadly as to compel a nonresident such as Ellwood to defend himself in the courts of this State.

Recognizing the fiduciary shield doctrine as valid Illinois law, we apply it to the present facts and hold that the circuit court erred when it denied Ellwood's motion to quash service of process on him for lack of personal jurisdiction. We further hold that the appellate court erred in denying Ellwood's petition for leave to appeal. (See *Keen v. Davis* (1969), 108 Ill. App. 2d 55, 58-59 (appellate court should grant leave to appeal if reasonably debatable grounds, fairly challenging the order, are pre-

sented).) Finally, we direct the circuit court to dismiss Ellwood from this cause of action.

## CONCLUSION

For the reasons stated, we reverse the circuit court's order denying the motions of defendants Sergeant John S. Ellwood and the City of Baltimore to quash service of process upon them for lack of personal jurisdiction, and we reverse the appellate court's order denying defendants' petitions for leave to appeal. We remand this cause to the circuit court and direct that, on remand, the circuit court dismiss defendants.

*Reversed and remanded,*
*with directions.*