Gregory GLASS, Plaintiff,

v.

KEMPER CORPORATION, et al., Defendants.

No. 95 C 3178.

United States District Court, N.D. Illinois, Eastern Division.

June 25, 1996.

Alan Jay Mandel, Chicago, Illinois, for Plaintiff.

Bennett L. Epstein, John Friedrich Zabriskie, Diane E. Gianos, Hopkins & Sutter, P.C., Chicago, Illinois, for Kemper Corporation.

Robert N. Hermes, Butler, Rubin, Saltarelli & Boyd, Chicago, Illinois, for The Prime Group, Inc. and Prime International, Inc.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is defendant Michael Oberst's motion to dismiss Counts I and VI of plaintiff Gregory Glass's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons that follow, the court grants Oberst's motion to dismiss.

## I. BACKGROUND

In its earlier opinion dismissing Count VI against Oberst's co-defendants, the court set out the events leading up to this litigation. *See Glass v. Kemper*, 920 F.Supp. 928 (N.D.Ill.1996). All of those facts need not be repeated here, but the court will recount the facts that relate specifically to Oberst and his motion to dismiss.

### A. Events preceding Glass's lawsuit [1]

In November 1992, Glass began working for Kepro, S.A. ("Kepro"), and defendant Prime Group, Inc. ("Prime"), in Barcelona, Spain, on the development of a shopping mall to be known as Diagonal Mar. Kepro and Prime were developing the mall for Kemper Corporation ("Kemper"). In May 1993, Oberst was hired by Kemper Financial Services, Inc. ("Kemper Financial"), a wholly owned subsidiary of Kemper, to oversee Kemper's Spanish real estate investments, including Diagonal Mar.

Oberst initially was named a vice president of Kemper Financial. In May 1994, Kemper took control of Kepro, Prime, and other entities affiliated with Diagonal Mar. At that time, Oberst became a Kemper employee and vice president, and was named managing director of Kepro and its Spanish subsidiaries and assumed responsibility for managing the overall development of Diagonal Mar. Also at that time, Glass became a Kemper employee under Oberst.

---

1. The following facts are taken from Glass's second amended complaint and Oberst's affidavit, attached to his memorandum in support of his motion to dismiss.

Oberst and Glass began negotiations for Glass's new employment agreement. However, in October 1994, Kemper, through Oberst, fired Glass. Glass filed a lawsuit in this court,[2] alleging various counts against various defendants. Against Oberst, Glass brought claims of fraud, based on the negotiations between Oberst and Glass, and violation of the Illinois Wage Payment and Collection Act.

## B. Oberst's contacts with Illinois [3]

Oberst currently lives in California, and lived in California prior to working for Kemper Financial and Kemper. From May 1, 1993, through December 3, 1995, Oberst lived as a legal Spanish resident in Barcelona, Spain. Oberst never has lived or maintained a residence in Illinois, owned real property in Illinois, maintained an office in Illinois, maintained a telephone number in Illinois, voted or been liable for income taxes in Illinois, or held a job in which he was based in Illinois.

From September 1988 through April 1993, Oberst worked as a senior vice president for Homart Development Company, which had its headquarters in Chicago. Oberst's office was in California, and he managed real estate projects in California and Texas. Since Homart was based in Chicago, Oberst's supervisors directed him to attend business events in Illinois periodically. Oberst made about four trips per year to Chicago during his employment with Homart.

Before hiring Oberst, Kemper Financial required Oberst to interview at its Chicago office. After hiring Oberst, Kemper Financial required Oberst to spend his first week in its Chicago office for orientation and to prepare to move to Barcelona. After that first week, Oberst was based in Barcelona.

During his week of orientation in Chicago before moving to Barcelona, Oberst made arrangements with the International Private Banking Department of the First National Bank of Chicago ("First Chicago") to have First Chicago maintain his checking, money market, IRA, and investment advisory accounts, pay his bills, and forward his mail to Barcelona.

Kemper Financial, Kemper, and Prime have their headquarters in Illinois. While working in Barcelona, Oberst attended seven board meetings in Chicago to give progress reports on Kemper's Spanish projects. Oberst also had occasional telephone conversations with people at Kemper, Kemper Financial, and Prime headquarters in Chicago. The telephone conversations involved issues that Oberst had to address with people at the headquarters.

Oberst did not meet with Glass during any of his trips to Illinois, and was in Spain when he sent Glass the memorandum terminating Glass's employment. However, in August 1994, during one of his visits to Illinois, Oberst discussed Glass's employment contract with John Neal, Oberst's immediate superior. Oberst also wrote letters to people in Chicago, including Neal, regarding Glass's and other employees' employment contracts. All of Oberst's communications with Glass regarding Glass's employment contract occurred outside of Illinois.

Oberst owns no ownership interest in Kemper Financial, Kemper, or Prime, nor equity interest in Diagonal Mar or any other Kepro real estate or entities. Oberst owns a small amount of Kemper stock.

In sum, Oberst's contacts with Illinois consist of several trips a year during his prior employment with Homart; interviewing with Kemper Financial in Chicago; orientation in Chicago at the start of his employment with Kemper Financial; seven trips to attend board meetings during his employment with Kemper Financial and Kemper; telephone conversations and written communications with people at Kemper Financial, Kemper, and Prime headquarters in Chicago; and

---

**2.** Glass brought his complaint in this court on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332.

**3.** The following facts are taken from Oberst's affidavit, attached to his memorandum in support of his motion to dismiss; Oberst's, John Neal's, and Michael Reschke's depositions, at-

tached to Glass's memorandum in opposition to Oberst's motion to dismiss; and various letters between Oberst and other Kemper, Kemper Financial, or Prime employees, also attached to Glass's memorandum in opposition to Oberst's motion to dismiss.

maintenance of a banking relationship with First Chicago, based in Chicago.

The question is whether these contacts with Illinois are sufficient to establish this court's jurisdiction over Oberst.

## II. DISCUSSION

### A. Previously dismissed Wage Payment and Collection Act claim

■ On April 1, 1996, the court dismissed Count VI of Glass's amended complaint, which alleged a violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1–115/16, on the ground that the Wage Payment and Collection Act only protects Illinois employees working for Illinois employers. Since Glass was not an Illinois employee at any time during his work on Diagonal Mar, the court ruled that he could not seek the protection of the Wage Payment and Collection Act. See Glass, 920 F.Supp. at 930–34.

While Oberst had not yet been served at the time the other defendants moved to dismiss Count VI, the court finds that its reasoning in dismissing that count applies as a matter of law to all defendants sued by Glass. Therefore, Count VI is dismissed as to Oberst as well. Only Count I, alleging fraud, remains pending against Oberst, and it is based on that count that the court must have personal jurisdiction over Oberst.

### B. Personal jurisdiction

■ In a case based on diversity of citizenship, a federal district court sitting in Illinois has personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction. Daniel J. Hartwig Assoc., Inc., v. Kanner, 913 F.2d 1213, 1216 (7th Cir.1990).

■ Under Illinois law, a plaintiff bears the burden of providing sufficient facts to establish personal jurisdiction. McIlwee v. ADM Industries, Inc., 17 F.3d 222, 223 (7th Cir.1994); O'Hare Int'l Bank v. Hampton, 437 F.2d 1173, 1176 (7th Cir.1971). In deciding a motion to dismiss for lack of personal

jurisdiction, the court may receive and consider affidavits from both parties. Turnock v. Cope, 816 F.2d 332, 333 (7th Cir.1987). The court resolves factual disputes in the pleadings and affidavits in favor of the plaintiff, but takes as true facts contained in the defendant's affidavit that remain unrefuted by the plaintiff. Boese v. Paramount Pictures Corp., No. 93 C 5976, 1994 WL 484622, *2 (N.D.Ill. Sept. 2, 1994) (citing Nelson v. Park Industries, Inc., 717 F.2d 1120, 1123 (7th Cir.1983), cert. denied, 465 U.S. 1024, 104 S.Ct. 1277, 1278, 79 L.Ed.2d 682 (1984)).

■ In determining whether it has jurisdiction, the court makes a two-part inquiry: "(1) whether the state statute allows jurisdiction, and (2) whether the assertion of jurisdiction complies with constitutional due process standards." Wilson v. Humphreys (Cayman) Ltd., 916 F.2d 1239, 1243 (7th Cir.1990), cert. denied, 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991).

■ However, Illinois amended its long-arm jurisdictional statute, effective September 7, 1989, by adding a provision that effectively collapses the two inquiries into one.[4] Illinois' long-arm statute now extends personal jurisdiction to the limit allowed under the due process clauses of the Illinois and United States constitutions. Dehmlow v. Austin Fireworks, 963 F.2d 941, 945 (7th Cir.1992); Wilson, 916 F.2d at 1243. Thus, the inquiry now is simply whether this court may assert in personam jurisdiction over a defendant consistent with due process. Wallace v. Herron, 778 F.2d 391, 393 (7th Cir. 1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986).

The court cannot look only to federal due process principles, however. The Illinois Supreme Court has held unequivocally that the Illinois constitution contains its own separate and independent guarantee of due process, which also must be satisfied for a court to have jurisdiction over a defendant. Rollins v. Ellwood, 141 Ill.2d 244, 275, 152 Ill.Dec. 384, 398, 565 N.E.2d 1302, 1316 (1990). See also Mors v. Williams, 791 F.Supp. 739, 741 (N.D.Ill.1992).

---

4. "A court may also exercise jurisdiction on any other basis now or hereafter permitted by the

Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2–209(c).

Thus, the court must take into consideration both federal and Illinois due process to determine whether jurisdiction is proper. If jurisdiction is improper under either federal or Illinois due process, this court cannot exercise jurisdiction over the defendant.

## 1. Federal due process

Due process measures the limits of personal jurisdiction by the strength of the relationship between the defendant and the forum state. Federal due process requires that the defendant have "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Courts have typically considered the due process analysis as a two-part inquiry: do minimum contacts exist, and if so, does the exercise of personal jurisdiction comport with traditional notions of fair play and substantial justice?

Minimum contacts are those acts by which the defendant has "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958), such that he should "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). If a defendant has purposefully availed himself of the privilege of conducting business within the state, he has enjoyed the benefits and protections of that state's laws such that jurisdiction over him satisfies due process. *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1240; *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389, 394 (7th Cir.1994).

Subject to the limits of due process, a court may exercise two types of personal jurisdiction over an out-of-state defendant: general and specific.

### a. General jurisdiction

General jurisdiction arises when the nonresident defendant has "continuous and systematic general business contacts" with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). The contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities." *International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159. This is a fairly high standard requiring a great amount of contacts, but permits the court to include in its analysis contacts with no relationship to the underlying dispute. *Wilson*, 916 F.2d at 1245; *Charlesworth v. Marco Manufacturing Co.*, 878 F.Supp. 1196, 1200 (N.D.Ind.1995).

For this court properly to exercise general jurisdiction over Oberst, then, Oberst's contacts with Illinois need not relate to Glass's fraud claim, but they must be continuous, systematic, and substantial. *See, Helicopteros*, 466 U.S. at 416, 104 S.Ct. at 1873; *International Shoe*, 326 U.S. at 318, 66 S.Ct. at 159; *Wilson*, 916 F.2d at 1245; *Charlesworth*, 878 F.Supp. at 1200.

Oberst's physical presence in Illinois was sporadic. He came to Illinois once to interview with Kemper Financial; once for a week-long job orientation for Kemper Financial; and several times per year, for one or two days at a time, to attend board meetings. Oberst's other contacts with Illinois were more regular, but still relatively insubstantial. Oberst occasionally had telephone conversations with and wrote letters to Kemper Financial, Kemper, and Prime employees in Illinois. He also maintained a banking relationship with First Chicago in Illinois.

Courts have found lack of general jurisdiction over nonresident defendants based upon much greater contacts with the forums than Oberst had with Illinois. *See, e.g., Helicopteros*, 466 U.S. at 411, 104 S.Ct. at 1870 (no general jurisdiction where nonresident defendant negotiated contract in forum; purchased 80 percent of its helicopter fleet, spare parts, and accessories from company in forum state; sent pilots to forum state for

training and to bring helicopters to South America; sent management and maintenance personnel to forum state for "plant familiarization" and technical consultation; and received over $5 million in payments drawn upon bank in forum state); *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 381 (9th Cir. 1990), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (no general jurisdiction where defendant advertised in forum state; mailed brochures and paid commissions to travel agents in forum state; and sold vacation cruises to residents of forum state); *Obermeyer v. Gilliland,* 873 F.Supp. 153, 157–58 (C.D.Ill.1995) (no general jurisdiction in Illinois where defendant truck driver, as his only route, regularly drove truck from Michigan to Illinois and was en route to Illinois when accident occurred in Michigan).

If the defendants in the foregoing cases were not found to have purposefully availed themselves of the forum states' benefits and protections such that their being sued in the forum states was foreseeable, then certainly Oberst's lesser contacts with Illinois did not forewarn him that he might be sued in Illinois.

In fact, Oberst's lack of contacts with Illinois overwhelms his few contacts with the state. Oberst has never lived in Illinois, owned real property in Illinois, maintained an office or telephone number in Illinois, voted in Illinois, or been liable for Illinois income taxes.

The court finds that Oberst's contacts with Illinois are too sporadic, tenuous, and insubstantial to warrant exercising jurisdiction over him for matters unrelated to his contacts with the state. Accordingly, the court finds it has no general jurisdiction over Oberst.

### b. Specific jurisdiction

Specific jurisdiction arises when the defendant's contacts with the forum are related to the controversy underlying the litigation. *Wilson,* 916 F.2d at 1244 (citing *Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. at 1872 n. 8). If such a relationship between the litigation and forum exists, the plaintiff need only show that the defendant's contacts with the forum reach a "minimum" threshold.

*Sutherland v. Cybergenics Corp.,* 907 F.Supp. 1218, 1222 (N.D.Ill.1995).

For the court to find that it has specific jurisdiction over Oberst, then, Oberst's contacts with the forum must be related to Glass's fraud claim. *See id.* Glass argues that Oberst's trip to Chicago in August 1994, during which he met with Neal and discussed Glass's employment contract, and Oberst's phone calls and letters to Chicago discussing Glass's and other employees' employment contracts constitute contacts related to the fraud claim.

To succeed on a claim for fraud against Oberst individually, Glass must allege and prove that (1) Oberst made a false statement of material fact; (2) knowing it was false; (3) with the intent to induce Glass to rely upon it; and that (4) Glass reasonably relied upon the misrepresentation (5) to his detriment. *See, e.g., Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 185–86, 65 Ill.Dec. 411, 418, 441 N.E.2d 324, 331 (1982). In his fraud claim, Glass alleges essentially that Oberst made repeated false statements to Glass during their negotiations over Glass's new employment contract. Glass alleges that he relied on the false statements to his detriment, in that he forfeited other job opportunities, sold his Atlanta home, and relocated to Spain. (Second Am.Compl. ¶¶ 32–35.)

Based on the parties' submissions to the court, it appears that if Oberst made any false statements to Glass, he did so in Spain. If Glass relied on any false statements of Oberst, then he did so in Spain, by remaining in Barcelona to work on Diagonal Mar. If Glass suffered any detriment, then he did so in Spain, or possibly in Atlanta, where he had a home that he sold allegedly based on Oberst's misrepresentations.

Illinois has no connection with any of these elements of fraud. Glass has not alleged or shown that any of the negotiations took place in Illinois, that he relied on Oberst's alleged misrepresentations in Illinois, or that he suffered any detriment in Illinois. Moreover, Glass has not alleged or shown that Oberst received instructions to deceive or discussed deceiving Glass during the August 1994

meeting or in phone calls or letters between Oberst and Kemper personnel in Chicago, or that Oberst's contacts with Kemper personnel in Illinois relate in any way to Oberst's alleged fraud. Thus, Glass has not shown that Oberst's contacts with Illinois allow the court to exercise specific jurisdiction over Oberst. Accordingly, the court finds that it has no specific jurisdiction over Oberst.

Since the court has found that Oberst did not have sufficient contacts with Illinois for the court to exercise either general or specific jurisdiction over him, the court need not engage in the second part of the federal due process analysis: whether exercising personal jurisdiction over Oberst would comport with traditional notions of fair play and substantial justice. However, the court will make the additional inquiry because it demonstrates the unfairness of exercising jurisdiction over Oberst.

In deciding whether the assertion of personal jurisdiction comports with fair play and substantial justice, the most important factors the court considers are the interests of the states involved and the relative convenience of litigating in the forum. *R–Five, Inc. v. Sun Tui, Ltd.*, No. 94 C 4100, 1995 WL 548633, *4 (N.D.Ill. Sept. 12, 1995) (citing *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen*, 444 U.S. at 294, 100 S.Ct. at 564, 565–66). These two factors weigh strongly against the court's asserting jurisdiction over Oberst.

Illinois has virtually no interest in being the forum for Glass's litigation. Oberst is not an Illinois resident. Glass is not an Illinois resident. Any alleged wrong that Oberst committed against Glass did not occur in Illinois. In short, neither Oberst nor Glass has any connection to Illinois beyond the fact that they both worked for Illinois companies or their subsidiaries. Thus, Illinois has nothing at stake in a dispute between Oberst and Glass.

Moreover, the court fails to see any convenience in litigating Glass's claim against Oberst in this forum. Glass does not live here. Oberst lives thousands of miles from here.

Forcing Oberst, a California resident, to litigate in this forum a claim that arose in Spain while Oberst was a Spanish resident imposes too great a burden on Oberst for this court to countenance.

Consequently, this court's exercising personal jurisdiction over Oberst fails to comport with fair play and substantial justice, particularly in light of the lack of contacts Oberst has with the forum. Accordingly, the court lacks jurisdiction over Oberst under the principles of federal due process.

While this conclusion disposes of Oberst's motion and Glass's claim against Oberst, the court nonetheless will address the issue of personal jurisdiction over Oberst under Illinois due process, since both parties address Illinois due process issues at length.

**2. Illinois due process**

Under the Illinois constitution's guarantee of due process, "[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins*, 141 Ill.2d at 275, 152 Ill.Dec. at 398, 565 N.E.2d at 1316.

Based on the fairness required by Illinois due process principles, a defendant in Illinois may raise a defense to personal jurisdiction known as the fiduciary shield doctrine. Pursuant to the fiduciary shield doctrine, a court cannot exercise jurisdiction over a nonresident defendant who has performed acts in Illinois solely as a representative of his employer, and not for his personal benefit. *Rollins*, 141 Ill.2d at 276, 152 Ill. Dec. at 398–99, 565 N.E.2d at 1316–17 (citing *Hurletron Whittier, Inc. v. Barda*, 82 Ill. App.3d 443, 448, 37 Ill.Dec. 838, 841, 402 N.E.2d 840, 843 (1980)).

In *Rollins*, Ellwood, a police officer and Maryland resident, entered Illinois solely in his capacity as a police officer, and arrested Rollins, a man believed wanted in Maryland. Unfortunately, Rollins was not the man wanted in Maryland, and was forced to spend several weeks in jail until the case of mistak-

en identity was cleared up. Rollins sued Ellwood and the city of Baltimore.

Finding that Illinois courts had no jurisdiction over Ellwood, the Illinois Supreme Court stated:

> We find that it is not fair, just, and reasonable for the Illinois courts to assert personal jurisdiction over one in Ellwood's situation. Ellwood entered into Illinois, and while in Illinois engaged in conduct giving rise to the present cause of action, solely in his capacity as a police officer acting for the Baltimore police department and the State of Maryland. The nature and quality of his actions in Illinois were characterized by his status as a police officer employed by these entities. Because Ellwood's conduct in Illinois was a product of, and was motivated by, his employment situation and not his personal interests, we conclude that it would be unfair to use this conduct to assert personal jurisdiction over him as an individual.

*Rollins,* 141 Ill.2d at 279–80, 152 Ill.Dec. at 400, 565 N.E.2d at 1318.

The court also found no exception to the fiduciary shield doctrine simply because "the employee is serving his own financial interests when he performs the tasks imposed upon him by his employer." *Id.* at 280, 152 Ill.Dec. at 400, 565 N.E.2d at 1318. The court stated that "[i]n practical terms, an employee ... has little or no alternative besides unemployment when ordered to enter another [s]tate to carry out the wishes of his employer." *Id.* The court stated further that it saw "no reason to fashion an exception to the fiduciary shield doctrine that will expose employees who engage in tortious conduct within the scope of their employment to the personal jurisdiction of Illinois courts." *Id.*

 It follows from *Rollins* that the fiduciary shield does not apply when the defendant was present in Illinois seeking to serve his personal interests, rather than those of his employer. *See, e.g., Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 912 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1964, 131 L.Ed.2d 855 (1995). However, several federal courts in Illinois have gone a step further, holding that where defendant

corporate officers were in positions to decide whether or not to make their contacts with the forum, it was fair and reasonable to subject them to the jurisdiction of the courts. *See Brujis v. Shaw,* 876 F.Supp. 975, 980 (N.D.Ill.1995), *Roy v. Austin Co.,* No. 94 C 740, 1995 WL 230949, *2 (N.D.Ill. Apr. 14, 1995).

 This court is not convinced that the Illinois Supreme Court in *Rollins* intended to have the discretion exception carved out of its fiduciary shield doctrine, but it makes no difference in the present case. The court finds that under *Rollins* and the federal courts' interpretation of the fiduciary shield doctrine, Oberst cannot be held to be within this court's jurisdiction.

Virtually all of Oberst's contacts with Illinois were in his capacity as an employee of corporations headquartered in Illinois. While employed with Homart, Oberst was required by his superiors to attend board meetings in Chicago. (Oberst Aff. ¶ 8; Oberst Dep. at 504–06.) Similarly, while employed with Kemper Financial and Kemper, Oberst attended orientation and board meetings in Chicago at the direction of his superiors. (Oberst Aff. ¶¶ 15–16.) He never chose whether, where, or when to have the meetings, or whether to attend them. (Oberst Aff. ¶ 16; Reschke Dep. at 108.) Specifically with respect to the August 1994 meeting with Neal, at which Oberst and Neal discussed Glass's employment contract, Neal asked Oberst to come to Chicago to attend some meetings. (Oberst Dep. at 316–17; Neal Dep. at 153–54.)

Oberst's letters to Kemper executives regarding Glass's and other employees' employment and his telephone calls to people at Kemper Financial, Kemper, or Prime in Illinois appear to have been necessary, strictly job-related, and within the scope of Oberst's employment. (Pl.'s Mot. in Opp. to Mot. to Dismiss Ex. C.; Oberst Aff. ¶ 17; Oberst Dep. at 310, 313–14.)

Oberst claims that he was required to have the foregoing contacts with Illinois in connection with his work in Barcelona on behalf of Kepro, and that he made his contacts with Illinois only because he was performing acts

for his employer's benefit and at the direction of his employer. (Oberst Aff. ¶ 15.) The evidence presented by both Oberst and Glass bears out this claim.

Furthermore, Oberst does not and did not own an interest in Kemper Financial, Kemper, Prime, Kepro, Diagonal Mar, or any other Kepro-related real estate, though he owns a very small amount of Kemper stock. (Oberst Aff. ¶ 19.) Thus, he did not personally benefit from firing Glass or maintaining contacts with Illinois beyond earning a salary for performing his job.

Glass has presented no evidence showing that Oberst exercised discretion over his contacts with Illinois or benefitted personally from his contacts. Glass simply states in conclusory fashion that Oberst decided to have contacts with Illinois because such contacts would benefit him. The evidence, including that submitted by Glass, distinctly shows the contrary. In addition, the Illinois Supreme Court has expressly foreclosed Glass's argument that Oberst benefitted financially from his Illinois contacts in that he was attempting to curry favor with his employer, presumably to remain employed and earn a salary or salary increase. *See Rollins,* 141 Ill.2d at 280, 152 Ill.Dec. at 400, 565 N.E.2d at 1318 (no exception to fiduciary shield doctrine simply because employee is serving own financial interests by performing tasks imposed on him by employer).

Moreover, Glass's second amended complaint belies his argument that Oberst was acting on his own accord when he fired Glass. The second amended complaint explicitly alleges that Oberst was acting as the agent or representative of Kemper, Prime, and Prime International, Inc., when he allegedly made fraudulent statements to Glass. (Second Am.Compl. ¶¶ 32, 34, 35.) If Oberst was acting only as his employers' agent when he allegedly committed fraud against Glass, then he falls squarely within the fiduciary shield doctrine with respect to any contacts with Illinois related to or arising out of his fraudulent acts.

Because Oberst made most of his contacts with Illinois solely as a representative of his employer, it would not be "fair, just, and reasonable" for this court to assert jurisdiction over him based on those contacts. *See Rollins,* 141 Ill.2d at 279–80, 152 Ill.Dec. at 400, 565 N.E.2d at 1318. The "nature and quality of [Oberst's] actions in Illinois were characterized by his status as" an employee of Illinois-based companies. *See id.* Because most of Oberst's conduct in Illinois "was a product of, and was motivated by, his employment situation and not his personal interests, ... it would be unfair to use this conduct to assert personal jurisdiction over him as an individual." *See id.*

Oberst's only Illinois contacts that were for his personal benefit and at his discretion are his relationship with First Chicago and his trip to Chicago to interview with Kemper Financial. These two contacts simply are not substantial enough to form the basis for this court's assertion of general jurisdiction over Oberst. *See* section II.B.1.a. above. In addition, both contacts are unrelated to Glass's cause of action against Oberst, and thus cannot form the basis for this court's exercising specific jurisdiction over Oberst. *See* section II.B.1.b. above. Accordingly, under the principles of Illinois due process and the fiduciary shield doctrine, the court finds that exercising personal jurisdiction over Oberst would be unfair and improper.

Because the court has found that asserting jurisdiction over Oberst would violate due process principles under the United States and Illinois constitutions, the court concludes that it has no jurisdiction over Oberst.

## III. CONCLUSION

For the foregoing reasons, the court grants defendant Michael Oberst's motion to dismiss Counts I and VI of plaintiff Gregory Glass's second amended complaint. Counts I and VI of Glass's second amended complaint are dismissed, and Oberst is dismissed as a party defendant.