**STATE SECURITY INSURANCE COMPANY, etc., Plaintiff,**

**v.**

**FRANK B. HALL & COMPANY, INC., et al., Defendants.**

No. 81 C 4167.

United States District Court, N. D. Illinois, E. D.

Dec. 31, 1981.

Robert A. Holstein, John M. Mack, Heidi M. Streeky, Holstein, Mack & Associates, Chicago, Ill., for plaintiff.

Terry M. Grimm, Duane M. Kelley, James R. Vogler, Steven G. Goldberg, Winston & Strawn, Chicago, Ill., for Frank B. Hall & Co.

John T. Wardrope, Sandra Young, Purcell & Wardrope, Chicago, Ill., for Thompson, Coe.

Ronald Butler, Gerald G. Saltarelli, Butler, Rubin, Newcomer & Saltarelli, Chicago, Ill., for Mendel S. Kaliff.

## MEMORANDUM OPINION AND ORDER

### SHADUR, District Judge.

State Security Insurance Company ("State Security") sues a number of corporate and individual defendants on behalf of itself and others it claims are similarly situated, based on common law fraud, conspiracy, contract and agency theories. It asserts a Texas-based insurance fraud of Texas-sized proportions, with an alleged peripheral impact in Illinois.

All the non-corporate defendants have moved for dismissal under Fed.R.Civ.P. ("Rule") 12(b)(2) for want of personal jurisdiction:

(1) 18 current or former directors, officers or employees of Frank B. Hall & Co. Inc. of Texas ("Hall of Texas") or its New York-based parent company, Frank B. Hall & Co. Inc. ("Hall");

(2) Mendel Kaliff ("Kaliff"), president of Morris H. Kaliff & Son Insurance Agency, Inc. ("Kaliff & Son") until its acquisition by Hall of Texas in July 1975 when he became president of Hall of Texas;

(3) a Dallas law firm, Thompson, Coe, Cousins & Irons ("Thompson, Coe").

After a brief summary of the relevant facts, this opinion will review the claims separately. Although the involvements of the several defendants differ substantially, bringing different legal principles into play, each is entitled to dismissal.

### Facts [1]

Hall is a Delaware corporation with principal offices in Briarcliff Manor, New York. Hall of Texas is a subsidiary of Frank B. Hall & Co. Brokerage, Inc., which is in turn a Hall subsidiary.

On July 8, 1975 Hall of Texas purchased the assets of Kaliff & Son, a San Antonio, Texas insurance agency. Two weeks later Hall of Texas and State Security entered into a "Surplus Lines General Agency Agreement" (the "Agreement"), under which Hall of Texas as agent for State Security was to sell the latter's policies of insurance. That Agreement was the product of prior negotiations between Kaliff & Son and State Security antedating the Hall of Texas acquisition.

In the summer of 1978 "certain practices of the San Antonio office involving the writing and reporting of carnival insurance were brought to the attention of Hall's management." [2] Hall's board of directors

---

1. Defendants' affidavits in support of their motions have addressed only their absence of contacts with Illinois, not the substantive merits of State Security's claim. This opinion of course makes no findings in the latter respect, simply accepting for current purposes the Complaint's allegations.

2. That language is taken from the memorandum of the 18 Hall director-officer-employees ("Dir.Mem."). As indicated in n.1, this opinion assumes those "practices" were as charged in the Complaint, where State Security claims that:

(1) Its agreement had been obtained by misrepresentations as to Kaliff & Son's "track record" in the insurance industry, the work it had done for other well-known insurance companies and the "average loss ratio" for the primary business Hall of Texas was selling—outdoor amusements.

ordered an investigation and then instituted a program of restitution under the supervision of the Texas Commissioner of Insurance. Both the investigation and the restitution program, which State Security claims was perhaps fraudulent and at least negligent, were carried out with the assistance of Thompson, Coe and another defendant, accounting firm Touche Ross & Co., Inc. ("Touche Ross").[3] As a result of the restitution program about $3 million was returned to various insurance carriers and insureds.[4]

This opinion assumes arguendo that the non-corporate defendants' involvement was as State Security claims:

(1) All 18 Hall director-officer-employees, acting in their respective capacities, took an active role in the illegal behavior of which State Security complains.

(2) Kaliff, as president of Kaliff & Son and then as president of Hall of Texas, was also an active participant in the alleged scheme to defraud.

(3) Thompson Coe was a willing and active participant as well.

### Exercise of In Personam Jurisdiction Generally

No federal statute prescribes the manner of service of process in diversity actions. Rule 4(d)(7) requires then that this Court look first to the Illinois rules governing exercise of *in personam* jurisdiction over nonresident defendants. *Forty-Eight Insulations, Inc. v. Johns-Manville Products Corp.*, 472 F.Supp. 385, 389 (N.D.Ill.1979).

That inquiry—whether the Illinois long-arm statute (Ill.Rev.Stat. ch. 110, § 17 ["Section 17"]) authorizes service of process on a defendant—does not end the analysis. There must be an affirmative answer to

both that question and the question whether the proposed exercise of personal jurisdiction comports with the due process requirements of *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny.

Until very recently that two-step inquiry had telescoped into one, for the Illinois Supreme Court had consistently said the Illinois General Assembly intended to extend the reach of Section 17 to the outermost boundaries permitted by the Due Process Clause. *Braband v. Beech Aircraft Corp.*, 72 Ill.2d 548, 557, 21 Ill.Dec. 888, 896, 382 N.E.2d 252, 256 (1978), *cert. denied*, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979); *Nelson v. Miller*, 11 Ill.2d 378, 389, 143 N.E.2d 673, 679 (1957). Under that concept the preliminary question of Illinois law had merged with the federal constitutional question. *Wisconsin Can Co. v. Banite, Inc.*, 88 F.R.D. 597, 600 (N.D.Ill.1980).

Now however the Illinois-federal correlation is less than one-to-one. In the October 1981 decision in *Green v. Advance Ross Electronics Corp.*, 86 Ill.2d 431, 436–37, 56 Ill.Dec. 657, 663–64, 427 N.E.2d 1203, 1206 (1981), Justice Simon wrote for a unanimous Illinois Supreme Court:

We do not, however, regard this observation [in *Nelson v. Miller*] as the equivalent of declaring that the construction and application of section 17(1)(b) depend entirely upon decisions determining in what circumstances due process requirements would permit long-arm jurisdiction. Neither do we read *Nelson* to say that in applying section 17(1)(b) we should not construe the meaning and intent of our own statute irrespective of the due process limitations generally ap-

---

(2) During negotiation of the Agreement Hall of Texas falsely represented (with knowledge of such falsity) that (a) it "maintained only one set of premium account books," (b) it did not retain any fees, commissions or other receipts except commissions authorized by the companies for which it wrote coverage and (c) premiums were always paid over to those companies on a timely basis.

**3.** In simplest terms, State Security claims that the Hall directors, Touche Ross and Thompson Coe caused only a small amount to be refunded to State Security and others in its position vis-a-vis Hall of Texas, while providing either an inadequate or no explanation of the fraudulent practices turned up by the internal investigation.

**4.** This information is drawn from Dir.Mem. 4 and is not contested by State Security.

plicable to State long-arm statutes. A statute worded in the way ours is should have a fixed meaning without regard to changing concepts of due process, except, of course, that an interpretation which renders the statute unconstitutional should be avoided, if possible. Thus, instead of turning to the array of tests which have been articulated to assist in determining whether long-arm statutes as applied exceed permissible constitutional boundaries, we prefer to resolve this appeal by looking to the meaning of our own statute. We determine first whether it should be construed in a way which embraces defendants' claim against Green, Sr. If the answer is in the negative, as we conclude it is, applying the tests the Supreme Court has fashioned in the following decisions to determine whether the assertion of jurisdiction by a State over a nonresident is prohibited by due process safeguards is unnecessary. [Citing *International Shoe* and its progeny.]

Because *Green* is too new a decision for its boundaries to be clearly visible,[5] one section of this opinion (that relating to Thompson, Coe) will in part reverse the two-step analysis. It will first examine whether Illinois process can constitutionally reach the out-of-state non-corporate law firm. Any negative answer to that question would then be supported a fortiori by *Green*,[6] but the Court will then consider the effect of *Green* taken alone.

### Hall's Directors, Officers and Employees

■ All 18 Hall directors, officers and employees assert that the "fiduciary shield" insulates them from suability in a jurisdiction like Illinois, where their sole contacts have been on behalf of their corporation. That doctrine has been succinctly summarized just last month in *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 at 902 (2d Cir. 1981):

The teaching of the courts of this Circuit and of New York is that there is a dichotomy between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing the amenability of such agents to personal jurisdiction solely on the basis of those acts. [Citing cases.] These cases have recognized that if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise, by that state, of jurisdiction over him personally on the basis of that conduct. Thus, his conduct, although it may subject him to personal liability, may not form the predicate for the exercise of jurisdiction over him as an individual. The underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.

To be sure, not all courts embrace the fiduciary shield doctrine (whether or not bearing that label) wholeheartedly.[7] But what is significant here is that recent *Illinois* cases have adopted and applied its precepts consistently. *Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.*, 66 Ill.App.3d 789, 797, 23 Ill.Dec. 352, 360, 383 N.E.2d 1379, 1385 (1st Dist. 1978); *Hurletron Whittier, Inc. v. Barda*, 82 Ill.App.3d

5. This is not said by way of criticism. Due process limitations on extraterritorial service have been defined on a case-by-case basis over the 35 years since *International Shoe* (indeed in a sense the evolutionary process has occupied the century since *Pennoyer v. Neff*, 95 U.S. 714, 5 Otto 714, 24 L.Ed. 565 (1878)). So too the Illinois line *within* the due process boundaries will necessarily be picked out over a period of years.

6. Illinois may not of course extend the reach of its long-arm statute *beyond* that permitted by *International Shoe* and its descendants. What *Green* teaches is that the Illinois long arm may, under appropriate circumstances, be *shorter* than due process would allow.

7. Thus a dictum in *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 619 (W.D.N.Y.1977) expressed the minority view that the doctrine should not be applied where the corporate agent has engaged in tortious activity.

443, 447, 37 Ill.Dec. 838, 842, 402 N.E.2d 840, 843 (1st Dist. 1980); *see also Insull v. New York World-Telegram Corp.*, 172 F.Supp. 615, 634 (N.D.Ill.1959), *aff'd* 273 F.2d 166 (7th Cir. 1959).

Thus if the *Marine Midland Bank* view of the doctrine is taken (under which it represents a judicial construction of the long-arm statute), the first step of the usual two-part analysis ends the inquiry: Illinois would not permit the use of Section 17 to hale the 18 individuals into court here for actions taken solely in their representative capacities. And if the issue is rather perceived in terms of due process (the second step of the two-part inquiry), this Court finds the prevailing view on that subject—as exemplified by Judge Weinstein's opinion in *Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1348 (E.D.N.Y.1981)—persuasive:

> Where the corporate agent engages in corporate business for the sole benefit of the corporation, it is difficult to see how the exercise of jurisdiction over one who has conducted no activities on his own behalf "comports with fair play and substantial justice."

*Accord*, such cases as *Hurletron Whittier; Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 92–93 (2d Cir. 1975); *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974); *Wilshire Oil Co. v. Riffe*, 409 F.2d 1277, 1280–82 (10th Cir. 1969).

No question exists as to the amenability of Hall or Hall of Texas to suit in Illinois. But because of established fiduciary shield principles, fully applicable to this case, the 18 Hall director-officer-employees may not be sued here by process served under Section 17. Their motion to dismiss is granted.

### Kaliff

Kaliff's motion poses only a bit more difficulty. Kaliff was unquestionably more involved than the 18 individuals just considered in the transactions upon which State Security's complaints of fraud and breach of agency are grounded.[8]

State Security asserts Kaliff was the "major stockholder, president and chief operating agent" of Kaliff & Son. But it alleges no facts (either in the Complaint or by affidavit) to remove the mantle of the fiduciary shield—as discussed in the preceding section—from Kaliff. As Judge Weinstein wrote in *Bulova*, 508 F.Supp. at 1348:

> As the term "fiduciary shield" suggests, this is an equitable doctrine. It should be followed not [ ] mechanically but with a sound exercise of discretion. If, for example, the parent lacked sufficient assets to respond or if it were a shell utilized by an individual defendant for his own benefit, the balance of fairness might be tipped and jurisdiction over the individual might lie.

No factor of any sort counseling that such discretion be exercised in favor of jurisdiction has been advanced by State Security. There is no hint that either Hall or Texas or Hall, its parent, is a "shell" or "lacks sufficient assets." Because Kaliff (like the 18 individuals already dealt with) took all the complained-of actions in his representative capacity, his motion to dismiss must also be granted under "fiduciary shield" principles.

### Thompson, Coe

Thompson, Coe was directly involved in the restitution program that forms the basis for many of the fraud counts in the Complaint. State Security alleges two Illinois "contacts" as the predicate for jurisdiction over the law firm:

> (1) As part of the alleged conspiracy to defraud carried out by Thompson, Coe and others, there were mailed into Illinois a false letter and check "designed to conceal the fraudulent conduct from

---

**8.** Both the Complaint and the affidavit of Steven A. Brody, a former officer of State Security, make clear that it was Kaliff who originated the idea of a relationship between State Security and his insurance agency, Kaliff & Son. Kaliff had numerous contacts with State Security during negotiation of the Agreement. Most or all of those negotiations took place while Kaliff was heading Kaliff & Son, before he became President of Hall of Texas.

plaintiff and class plaintiffs." Copies of the same letter, together with similar checks, were sent to many other companies, all or substantially all of whom were not located in Illinois.

(2) Injury was caused to State Security in Illinois. That conclusion is based on the premises that Thompson, Coe's torts caused injury to State Security and that State Security is headquartered here—hence the injury to State Security is said to have occurred here as well.

Thompson, Coe's motion poses the problem whether such claimed "contacts" with the forum are sufficient to invoke jurisdiction over the firm consistently with both Section 17 and the Due Process Clause.

In Section 17 terms that question becomes whether the Illinois-related activity rose to the level of Thompson, Coe's "commission of a tortious act within this State" (Section 17(1)(b)). Both on that score and in due process terms, the recent Illinois Supreme Court decision in *Green* is highly instructive.

In that case two corporations, one incorporated and the other headquartered in Illinois, sought to join a Texas resident as a counterdefendant in an Illinois lawsuit. At every level—the trial court, the Appellate Court and the Supreme Court—the Texan's motion to dismiss for lack of personal jurisdiction was upheld.

Both sides in *Green* agreed that all alleged misconduct of defendant Green took place in Texas (the substantive claim involved misappropriation of corporate assets and conversion), but counterplaintiffs asserted jurisdiction on the fact that "the consequences of his misconduct were felt in Illinois." 86 Ill.2d at 438, 56 Ill.Dec. at 661, 427 N.E.2d at 1207. That notion was rejected by the Illinois Supreme Court, *id.* at 439, 56 Ill.Dec. at 662, 427 N.E.2d at 1207–08:

> If [that] approach is sound, it is difficult to see how its application can be restricted to financial torts. It would seem equally logical to permit anyone who sustains physical injuries anywhere to institute his action in Illinois if he resides and

maintains a bank account here which is diminished by payment of medical bills. To permit no-holds-barred long-arm jurisdiction of that type, even if contemplated by a State statute, would not pass muster under the due process requirements applicable to long-arm jurisdiction.

There is no inconsistency between *Green* and earlier Illinois long-arm cases. *Green* distinguished both *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 435, 176 N.E.2d 761, 762–63 (1961) and *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1142 (7th Cir. 1975) on the ground that in those cases the injury was undeniably suffered in Illinois. In *Gray* the plaintiff sustained personal injuries when the defendant's defective safety valve, manufactured and incorporated into a water heater outside the state, exploded in Illinois. In *Honeywell* the tort was inducement of patent infringement, which under the case's unusual fact situation had at least as much connection to Illinois as any state in the union. Thus the *Green* court concluded that the Illinois nexus claimed by the counter-plaintiffs there was "far too attenuated"—more like the situation found wanting in due process terms in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299, 100 S.Ct. 559, 562, 62 L.Ed.2d 490 (1980).

It is scarcely necessary to rehearse the factual parallels (even to the Texas situs!) between *Green* and this case. Does the addition of the letter and check mailed to State Security in Illinois, with the participation of Thompson, Coe, change the *Green* calculus? It should not. In *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596 (7th Cir. 1979) our Court of Appeals held that due process precluded service of process on an out-of-state corporate purchaser whose only contacts with the forum were telephone and mail communications with a forum-based manufacturer with whom the defendant had placed an order. *Accord, Koster v. Automark Industries, Inc.*, 640 F.2d 77 (7th Cir. 1981).

Here as in *Lakeside Bridge* and *Koster Thompson*, Coe has taken no action "purposefully [to] avail itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Indeed there was even *less* evidence of "purposeful availment" here than in those other cases, for Thompson, Coe was but one of many participants allegedly involved in the fraudulent letter, and the letters and checks were distributed not only in Illinois but around the country. In *Lakeside Bridge* the defendant knowingly involved itself with an in-state party. At no time was Thompson, Coe alleged to have been even *aware* of the contacts with State Security, much less to have been "purposeful."

At a minimum *Green* represents persuasive authority that State Security's contention of an Illinois injury (sufficient to ground jurisdiction) must fail. *Lakeside Bridge* teaches that mailing the letter and check into Illinois is an insufficient basis for jurisdiction as a matter of due process. *Taken together*, those two tangential connections of Thompson, Coe with the forum state cannot justify jurisdiction: One is utterly null for jurisdictional purposes and the other is too trivial to satisfy traditional concepts of fairness.

As already indicated (see text at n.6), that determination might well obviate the need to make the same analysis in Section 17 terms. Nonetheless this Court has essayed the Supreme-Court-predictive process described in *National Can Corp. v. Whittaker Corp.*, 505 F.Supp. 147, 148 n.2 (N.D.Ill. 1981). Based on the clear import of *Green* it has concluded that whether or not mandated by the Due Process Clause, the Illinois Supreme Court would not permit the assertion of jurisdiction over Thompson, Coe under Section 17(1)(b).

Both the Due Process Clause and Section 17 thus lead to the same result. Thompson, Coe's motion to dismiss must also be granted.

*Conclusion*

For the foregoing reasons the motions to dismiss of all the non-corporate defendants are granted. This action will proceed solely against the several corporate defendants.