**FRANK LEFITI, Plaintiff,**

**v.**

**FORD MOTOR COMPANY, and DOES I through X, Defendants.**

High Court of American Samoa
Trial Division

CA No. 90-04

October 18, 2005

Before RICHMOND, Associate Justice; LOGOAI, Chief Associate Judge; and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Jeffrey Waller
          For Defendant, Marie A. Ala`ilima

ORDER GRANTING MOTION TO SET ASIDE DEFAULT AND
DENYING MOTION TO DISMISS FOR LACK OF JURISDICTION
AND INSUFFICIENT SERVICE OF PROCESS

## Background

On November 5, 1999, Plaintiff Frank Lefiti ("Lefiti"), a resident of American Samoa, purchased a new 2000-year model Ford F-150 truck at a Ford Dealership in Honolulu, Hawaii. Lefiti subsequently shipped the truck to American Samoa. On October 14, 2003, Lefiti observed that his truck, parked outside his house, was on fire. He later received an investigative report by the Department of Public Safety purporting that the fire was the result of an electric malfunction in the truck's engine compartment.

On September 22, 2004, Lefiti filed an action in this Court against Defendant Ford Motor Company ("Ford"), as well as several unidentified defendants, for: (1) breach of implied warranty for fitness of use; (2) breach of implied warranty of fitness for particular purpose; (3) breach of implied warranty for merchantability; (4) negligence; (5) strict liability; and (6) "malfunction of vehicle." On October 28, 2004, we granted leave to serve process on Ford outside of American Samoa by publication in accordance with A.S.C.A. §§ 43.0501-.0504. On December 23, 2004, Ford was personally served in Dearborn, Michigan, pursuant to A.S.C.A. § 43.0504.

On March 2, 2005, Ford specially appeared challenging this Court's jurisdiction and its order granting service by publication by motion to dismiss under T.C.R.C.P. 12(c)(2) and (5). On May 11, 2005, we denied Ford's motion to dismiss but granted its motion to quash the service by publication order. We then granted leave to serve process on Ford through the Treasurer of American Samoa in accordance with A.S.C.A.

§§ 3.0103 and 30.0310. Subsequently, on May 18, Lefiti served the summons and complaint on the Treasurer pursuant to A.S.C.A. § 30.0310. The Treasurer mailed the summons and complaint by registered mail to Ford on June 23, 2005. Ford received it on June 30, 2005.

On July 18, 2005, Lefiti requested an entry of default. On July 19, 2005, the clerk of the court entered default against Ford. Lefiti contemporaneously filed a motion for default judgment which was duly set by the clerk for hearing on August 18, 2005. On July 29, 2005, Ford moved to set aside the clerk's default, and on August 8, 2005, filed an amended motion to set aside the clerk's default. On August 10, 2005, Lefiti filed an opposition to Ford's amended motion.

Concurrent with Lefiti's request for entry of default, Ford filed its responsive pleading; a renewed motion to dismiss under T.C.R.C.P. 12(c)(2) and (5) (the "Renewed Dismissal Motion") that again challenges this Court's jurisdiction and claims insufficient service of process, and requests the Court to quash our order authorizing service under A.S.C.A. §§ 3.0103 and 30.0310. On August 10, 2005, Lefiti filed a response to these motions.

All matters were set for hearing on August 18, 2005. For the reasons stated below, we grant Ford's motion to set aside the default and deny Ford's motion to dismiss for lack of jurisdiction and insufficient service of process.

## Discussion

### I. Timeliness of Ford's Renewed Dismissal Motion

As an initial matter, we feel it appropriate to address the timeliness of the Renewed Dismissal Motion.

#### A. Timeliness Under T.C.R.C.P. 12(a)

T.C.R.C.P. 12(a) provides that a defendant shall serve his answer within 20 days after being served with the summons and complaint. At issue here is whether Ford filed the Renewed Dismissal Motion before the expiration of the Rule 12(a) statutory deadline. The issue turns on our interpretation of when service is complete under the statute.

In our May 11 order, after quashing our previous order for service by publication, we authorized service of process on Ford under A.S.C.A. § 30.0310, which allows for service of process on foreign corporations. Section 30.0310 provides the following:

If the agent required by paragraph 6 of 30.0302 cannot be found within American Samoa, service of process may be made upon the [foreign] corporation through the Treasurer of American Samoa by sending the original and 2 copies to him, and on *the original of which he shall accept service on behalf of the corporation.* He shall retain one copy for his files and *send the other by registered mail* to the corporation at the address of its home office as shown by the records in his office, *which service shall have the same force and effect as if lawfully made upon the corporation.* [Emphasis added].

Lefiti argues that the statute offers two possible dates for completion of service. First, Lefiti contends that the language "the original of which he shall accept service on behalf of the corporation" indicates that service is complete upon delivery of the summons and complaint to the Treasurer. Second, given the language "send the [summons and complaint] by registered mail . . . which service shall have the same force and effect as if lawfully made upon the corporation," Lefiti maintains that service might also be complete upon the Treasurer's mailing of the complaint and summons to the foreign corporation. Therefore, according to Lefiti, either on the day (May 18, 2005) he served the summons and complaint on the Treasurer of American Samoa, or on the day (June 23, 2005) the Treasurer mailed the summons and complaint to Ford, service upon Ford was complete. Even though Ford did not receive the summons and complaint until June 30, 2005, Lefiti insists that service under A.S.C.A. § 30.0310 was effectuated at one of these earlier dates.·

Based on Lefiti's reading of A.S.C.A. § 30.0310, in accordance with T.C.R.C.P. 12(a), Ford had either until June 7, 2005, or at the latest, July 13, 2005, to file a responsive pleading. However, Ford did not file an answer by July 13, 2005, and did not file the Renewed Dismissal Motion until July 18, 2005, five days after Lefiti's claimed deadline for filing a responsive pleading. Thus, Lefiti contends that the Renewed Dismissal Motion was untimely filed and the time period for Ford to file an answer expired.

We disagree. Given the inherent ambiguity of A.S.C.A. § 30.0310 regarding date of service, and the inequitable result that would follow from Lefiti's statutory interpretation, we find that service was complete on June 30, 2005, the day Ford actually received the summons and complaint. Because § 30.0310 is unclear as to when service is complete, as evidenced by Lefiti's reference to two different dates present in the statute, Ford was not put on notice as to the date of service. Ford could not have reasonably known that the Rule 12(a) time period would start running before it actually received the summons and complaint.

Moreover, fairness and justice dictate that we find the Renewed Dismissal Motion timely filed under Rule 12(a). We would be unfairly punishing Ford by requiring that they file a responsive pleading or other timely motions without knowing the contents of the complaint. Since Ford did not receive the summons and complaint until June 30, 2005, a answer was not due until 20 days later on July 20.

In conclusion, because Ford filed the Renewed Dismissal Motion on July 18, we hold the Renewed Dismissal Motion timely filed under Rule 12(a) and toll the time period within which Ford must file a responsive pleading.

B. Timeliness Under A.S.C.A. § 43.0802(a)

A.S.C.A. § 43.0802(a) requires a motion for new trial or reconsideration to be filed 10 days after the court announces its judgment. If a motion for reconsideration or new trial is not filed within 10 days after announcement of the judgment, the court no longer has the power to reconsider or amend its judgment and the losing party no longer has a right to appeal. *In re Matai Title Muagututi`a*, 15 A.S.R.2d 1, 2 (Land and Titles Div. 1990). Thus, where a party appears in court to contest jurisdiction and loses, if the party does not appeal the adverse decision within the statutorily specified time period, the court's decision regarding jurisdiction becomes *res judicata*. *See Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 525-26 (1931).

On May 11, 2005, we issued an order denying Ford's motion to dismiss for lack of personal jurisdiction but quashing our previous order for service by publication. While we held that jurisdiction over Ford was proper, we found service insufficient. According to Lefiti, Ford had 10 days from the date of judgment within which to challenge the Court's ruling on jurisdiction. Because Ford did not file a reconsideration motion by May 21, and instead waited until July 18 to file the Renewed Dismissal Motion, Lefiti contends that the Court's decision on jurisdiction became *res judicata*.

We disagree. We find A.S.C.A. § 43.0802(a) and its 10-day deadline for filing a reconsideration motion inapplicable to this case. Because we quashed Lefiti's initial service upon Ford, our judgment on personal jurisdiction could not take effect until proper service was executed. Thus, our ruling on personal jurisdiction was not an appealable order and not subject to § 43.0802(a). At the May 11 "announcement of the judgment," this Court did not have personal jurisdiction over Ford.

Consequently, at that time, Ford had nothing to appeal.[1] It was not until June 30, when Ford received from the Treasurer the summons and complaint, that this Court acquired jurisdiction over Ford. From that date, Ford had 20 days within which to respond to the complaint. Ford filed the Renewed Dismissal Motion on July 18, two days before the 20-day deadline expired.

## II. Motion to Set Aside Entry of Default

### A. Legal Standard

T.C.R.C.P. 55 provides in relevant part:

> (a) **Entry**. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default.
> (c) **Setting Aside Default**. For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with TCRCP 60(b).

Courts enjoy broad discretion in deciding a motion to set aside entry of default for good cause under Rule 55(c). *See Sires v. Berman*, 834 F.2d 9, 14 (1st Cir. 1987). Rule 55(c) permits the court to set aside entry of default for "good cause shown." The good cause analysis considers factors such as: (1) whether the default was willful; (2) whether the defendant acted in bad faith; (3) whether setting aside the default will prejudice the plaintiff; (4) whether the plaintiff's claim involved a substantial sum of money; and (5) whether there was doubt about whether the complaint and summons were properly served. *See Pene v. American Samoa Power Auth.*, 8 A.S.R.2d 78, 79-80 (Trial Div. 1988).

### B. Good Cause Analysis

Applying the above factors to this case, we find good cause to set aside the clerk's entry of default.

---

[1] Of course, if we had found Lefiti's initial service proper, then Lefiti would be correct in his conclusions.

### 1. Willfulness and Bad Faith

■ A defendant's conduct is willful if he has received actual or constructive notice of the filing of the action and intentionally failed to answer. *TCI Group Life Inc. Plan v. Knoebber*, 244 F.3d 691, 697 (9th Cir. 2001). Lefiti contends that Ford's failure to file an answer within the 20 day answer period was willful and therefore shows bad faith.

We disagree. As stated in the previous section, service upon Ford under A.S.C.A. § 30.0310 was complete when Ford received the summons and complaint on June 30, 2005, not the earlier date of May 18 used by Lefiti in his motion for default. Ford filed the Renewed Dismissal Motion on July 18, 2005, two days before the T.C.R.C.P. 12(a) prescribed time period for filing an answer expired. Clearly, Ford did not intentionally ignore Lefiti's complaint. Nor did Ford act in bad faith.

Moreover, even if we were to rule service complete on either of the earlier dates suggested by Lefiti, we could not find that Ford willfully or in bad faith failed to answer. Ford believed service to be complete on June 30, 2005, the day it received the summons and complaint. Given the statute's ambiguity concerning the date of service, this conclusion is just as plausible as the two dates posited by Lefiti. Ford's confusion over the date of service is not equivalent to acting in bad faith or intentionally ignoring the complaint. Rather, its continual and ongoing activity in this matter, as illustrated by the Renewed Dismissal Motion and Ford's previous motion to dismiss, express a conscious effort by Ford to respond to the complaint in a timely manner.

### 2. Prejudice to Lefiti

■ To be prejudicial, the setting aside of an entry of default must result in greater harm than simply delaying resolution of the case. *TCI*, 244 F.3d at 701. Lefiti argues that beyond any delay caused by setting aside the default, he is also prejudiced because his expectations concerning the judgment and belief in the integrity of the judicial system will be compromised. Lefiti insists that his expectations would be flouted by Ford with impunity.

Having given due regard to potential prejudice to Lefiti, we fail to see how setting aside the default harms Lefiti beyond simply delaying resolution of the case. In fact, given our ruling that service was complete on June 30, and a responsive pleading not due until July 20, the clerk's entry of default on July 18 was actually premature. As such, any resulting delay need not be viewed as prejudicial to Lefiti.

Furthermore, considering that Ford filed the Renewed Dismissal Motion on the same day (July 18), Lefiti's "expectations" concerning judgment are in no way compromised. While the slight delay may have caused unnecessary inconvenience to Lefiti in first having to seek default measures, and then finding himself having to contest a defense motion to set that default aside, these inconveniences are hardly sufficient grounds to tip the balance of equities against Ford.

### 3. *Amount of Lefiti's Claim*

A claim involving a substantial sum of money has been a recurring ground in this court to favor a hearing on the merits over adjudication by default proceedings. *Pene*, 8 A.S.R.2d at 80. Although Ford, as Lefiti points out, is a multi-billion dollar company, the almost $32,000 Lefiti seeks in damages is still substantial. Thus, on this basis alone, we are inclined to set aside the default.

### 4. *Proper Service*

Lastly, as previously addressed in this order, there was considerable doubt as to the date of service of the complaint and summons. Because this date triggers the 20-day period for answering the complaint, uncertainty over this significant date argues in favor of setting aside the clerk's default.

### C. Conclusion

Having found good cause, and exercising this court's oft-stated preference of a trial on the merits to summary proceedings, we grant Ford's motion to set aside default.[2]

---

[2] Although we grant Ford's motion to set aside default, we take serious issue with Ford's briefing. Nowhere in Ford's motion to set aside default or amended motion to set aside default does Ford address the legal standard under Rule 55(c) for setting aside default or the applicable good cause analysis under this rule. In fact, Ford fails to mention Rule 55(c) or "good cause" altogether. While Ford does an adequate job of setting forth relevant facts and raising pertinent issues, Ford neither explains how such facts or issues provide legally sufficient grounds for setting aside the default, nor cites to any authority supporting its contentions.

If Ford wishes to make extra-legal policy arguments or talk at length about jurisdictional issues, this is of course permitted. But a motion before this Court that does not place these arguments within the framework of the appropriate legal standard(s) is by its nature insufficient. The latitude given by this Court in construing Ford's

## III. Renewed Motion to Dismiss

Having granted Ford's motion to set aside default, we now turn to the contents the Renewed Dismissal Motion.

### A. Personal Jurisdiction

In the Renewed Dismissal Motion, Ford maintains that neither constitutional due process nor American Samoa's long-arm statute confers jurisdiction over Ford. Accordingly, Ford asks this Court to dismiss the action before us for lack of personal jurisdiction.

#### 1. Constitutional Due Process

In what amounts to a restatement of arguments made in its previous motion to dismiss, Ford contends that it does not have sufficient minimum contacts with the territory such that it could reasonably anticipate being hailed into court here. Yet Ford fails to point to any new material facts or controlling authority that we overlooked in our original order.

Consequently, we reject Ford's request to relitigate an issue already determined in this Court's May 11 order. We have already held that Ford's continuous and substantial contacts with American Samoa satisfies constitutional due process requirements for personal jurisdiction. Even though Lefiti's causes of action may be unrelated, in a strict sense, to Ford's forum activities, the general jurisdiction[3] afforded under the Due Process Clause still permits Ford to be hailed into court here. Thus, we need not address Ford's rehashed arguments on this issue.

---

arguments is by no means guaranteed. Consequently, in future motions before this Court, we ask that Ford properly plead the legal standard and make its arguments within some type of legal framework.

[3] General jurisdiction refers to a court's authority to hear all claims against a defendant, at the place of the defendant's domicile or the place of service, without any showing that a connection exists between the claims and the forum state. BLACK'S LAW DICTIONARY 869 (8th ed. 2004).

Specific jurisdiction is more limited, referring to jurisdiction that stems from the defendant's having certain minimum contacts with the forum state so that the court may hear a case whose issues *arise from* those minimum contacts. (emphasis added). *Id.* at 870.

## 2. Territorial Long-Arm Statute

While we find jurisdiction over Ford constitutionally permissive, were our long-arm statute more jurisdictionally restrictive than the scope of general jurisdiction allowed by the Constitution, Ford may be able to prevail in its motion. We ruled in our May 11 order that it is not. We found that our long-arm statute, A.S.C.A. § 3.0103, also allowed for general jurisdiction.[4] Accordingly, we held that because Ford has "transacted business within the territory" within the meaning of A.S.C.A. § 3.0103(b)(1), our long-arm statute conferred jurisdiction over Ford.

However, in our original order, we neglected to address the significance and meaning of the language "arising out of" as contained in Section 3.0103. In the Renewed Dismissal Motion, Ford directs our attention to this pertinent statutory language, arguing that such language is limiting in scope, conferring specific jurisdiction over non-resident parties, but not permitting the more expansive general jurisdiction allowed under constitutional due process. We deal with this language below.

A.S.C.A. § 3.0103(b) provides:

> (b) Any person, firm or corporation, whether or not a citizen or resident of this territory, who, in person or through an agent, takes any of the following actions, thereby submits, and if a corporation, submits its personal representative, to the jurisdiction of the courts of this territory, as to any cause of action, suit or proceeding *arising out of* such action:
> (1) *the transaction of any business within this territory;*
> (2) the commission of a tortious act within this territory;
> (3) the ownership, use, or possession of any real estate in this territory;
> (4) contracting to insure any person, property or risk within this territory at the time of contracting (emphasis added).

According to Ford, the statute requires a plaintiff's cause of action to "arise out of" a corporation's "transactions" within the territory in order for the court to have jurisdiction over the matter. In other words, Ford argues that even if constitutional due process permits general jurisdiction over Ford, American Samoa's more restrictive long-arm statute authorizes only specific jurisdiction. Ford contends that the "arising out

---

[4] Because we interpreted § 3.0103 to provide general jurisdiction, we noted that even if Lefiti's causes of action were unrelated to Ford's transacted business within American Samoa, jurisdiction could arise from Ford's general, more persistent, but unrelated contacts with the territory.

of" language in A.S.C.A. § 3.0103(b) expresses the Legislature's clear intent to not extend jurisdiction to the extent available under constitutional due process. Ford asserts that had the Legislature wished its long-arm provision to be interpreted as broad as the Constitution permits, it would not have used the limiting language that it did. Thus, Ford argues that because Lefiti's causes of action did not "arise out of" Ford's transacted business with American Samoa, § 3.0103(b) does not confer jurisdiction over Ford.[5]

▪ The issue, then, is one of statutory interpretation. Accordingly, we first look to previous cases that have addressed § 3.0103(b). Unfortunately, little if any of our case law speaks directly to the issue. Only one case, *Patau v. Rosendahl Corp*, 16 A.S.R.2d 96 (Trial Div. 1990), touches upon the language of our long-arm statute. In *Patau*, an off-island corporation who had manufactured a conveyor system for use in California, but whose system was removed to American Samoa without their doing or knowledge, was sued in this Court for injuries occurred in the territory that allegedly resulted from the conveyor belt's faulty design. *Id.* at 98-99. The defendant corporation argued that A.S.C.A. § 3.0103(b)(2) "predicates jurisdiction only upon the commission of a tortious act within American Samoa, whereas it does not encompass a cause of action stemming solely from an on-island injury which resulted from an off-island wrong." *Id.* at 97-98.

This is essentially the same argument before us today. Regrettably, the *Patau* court chose not to discuss jurisdiction under our long-arm statute, instead ruling that the defendant corporation had insufficient minimum contacts to subject it to jurisdiction to the extent allowed under constitutional due process. *Id.* at 99. While the court engaged in a detailed analysis of constitutional due process, they punted on interpreting our long-arm statute.[6] Thus, we treat the issue before us as

---

[5] Additionally, Ford still maintains that it did not "transact business" within the territory. It argues in the alternative, however, that even if they did "transact business" within the territory, it is still not subject to jurisdiction. In our May 11 order we found that Ford did indeed transact business in American Samoa within the meaning of the statute. Thus, the issue is whether the "arising out of" language in our long-arm statute restricts this Court's jurisdiction to less than what is constitutionally permissive.

[6] Lefiti incorrectly asserts that *Patau* stands for the proposition that American Samoa's long-arm statute reaches to the extent allowed by the U.S. Constitution. The court in *Patau* never reached this issue. Thus, while Lefiti is free to argue in favor of a particular interpretation of *Patau*, it is both erroneous and unethical to claim that a case definitively

one of first impression.

In order to determine the reach of the territory's long-arm statute, we now look to the following: (i) the plain word meaning of the statute; (ii) legislative intent; and (iii) how courts in other jurisdictions with similar long-arm statutes have interpreted the "arising out of" language.

### i. Plain Word Meaning

First, we examine the language of § 3.0103(b). Giving the statutory language its plain word meaning, jurisdiction under our long-arm statute seems to be more restrictive than under the Constitution. Indeed, one cannot erase from the statute its "arising out of" language. As a result, based on a plain word reading of § 3.0301(b), it appears that the statute does not reach to the extent allowed by the Constitution.

### ii. Legislative Intent

Second, we consider whether the Legislature intended to craft a more jurisdictionally restrictive statute than the scope permitted under the Constitution. While we give due note to the Legislature's decision to include the "arising out of" in A.S.C.A. § 3.0103(b), it is unclear what meaning the Legislature intended to afford such language. The Legislature enacted § 3.0103(b) in 1962, worded substantively the same as now, well before the Supreme Court finished articulating the extant constitutional standard for personal jurisdiction. *See e.g., World-Wide Volkswagen,* 444 U.S. 286 (1980); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408 (1984); *Burger King Corp. v.*

*Rudzewicz,* 471 U.S. 462 (1985); *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102 (1987).

Therefore, the Legislature, in 1962, may have intended to conform the territory's long-arm statute to the constitutional standard of that time. Even so, it is difficult to discern whether the Legislature wished our long-arm statute to be dynamic, and thus be equated with changing federal standards of due process, or whether it was meant to be fixed in its 1962 status. Nevertheless, we believe that the spirit and intent of A.S.C.A. § 3.0103(b), unless expressly stated otherwise in the statute, compels an interpretation more in line with the former. Given our own legislative and judicial inaction concerning our long-arm statute, however, it is necessary to explore how other jurisdictions have dealt with the same issue.

---

represents a proposition that it does not.

### iii. Other Jurisdictions

We now examine how other jurisdictions with comparable long-arm statutes have construed the "arising out of" language.

### Illinois

Illinois' long-arm statute provides in relevant part:

> (a) Any person, whether or not a citizen or resident of this State who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action *arising from* the doing of any such acts: (1) The transaction of any business within this State . . . .

735 ILL. COMP. STAT. ANN. 5/2-209 (2005) (emphasis added).

For a long time Illinois courts interpreted this language broadly, granting jurisdiction in line with constitutional due process standards. *See Braband v. Beech Aircraft Corp.*, 367 N.E.2d 118, 121 (Ill. 1977). Subsequent to *Braband*, however, the Illinois Supreme Court switched gears, holding that the state's long-arm statute was not to be equated with any ongoing federal expansion of the Due Process Clause. *See Cook Associates, Inc. v. Lexington United Corp.*, 429 N.E.2d 847, 850 (Ill. 1981); *see also Green v. Advance Ross Electronics Corp.*, 427 N.E.2d 1203, 1206 (Illinois 1981) (declaring independence from any ongoing federal expansion of the Due Process Clause).

After *Cook* and *Green*, it was clear that even if the proposed exercise of personal jurisdiction over a foreign defendant met federal constitutional requirements of due process, it may not be authorized under the stricter Illinois statutory requirement. *See State Security Insurance Co. v. Frank B. Hall & Co.*, 530 F. Supp. 94, 96-97 (N.D. Ill. 1981). Thus, at that time, the analysis under the long-arm statute required a three-prong inquiry to determine personal jurisdiction: (1) whether the foreign defendant's conduct fell within the acts enumerated in the long-arm statute; (2) *whether the cause of action arose from these acts*; and (3) whether the exercise of personal jurisdiction was consistent with due process. *See id.* at 96 [emphasis added].

However, in September 1989, Illinois amended its long-arm statute to include a catch-all provision granting state court jurisdiction over all matters in which the state may constitutionally assert jurisdiction. *See* 735 ILL. COMP. STAT. ANN. 5/2-209(C) (2005). The 1989 amendment

obviated the "arising from" statutory language as personal jurisdiction in Illinois became co-extensive with the limits of due process. *See Dehmlow v. Austin Fireworks*, 963 F.2d 941, 945 (7th Cir. 1992).

Illinois has not been alone in amending their long-arm statute. Indeed, many other jurisdictions have also added a catch-all provision to counteract the "arising from" or "arising out of" language found in other sections of their long-arm statutes. *See e.g.,* Pennsylvania, 42 PA. CONS. STAT. ANN. § 5322(b) (2005); Florida, FLA. STAT. ANN. § 48.193(2)(2005).

*Ohio*

Ohio's long-arm statute provides the following in relevant part:

> (A) A Court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action *arising from* the person's: (1) Transacting any business in this state . . . (C) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

OHIO REV. CODE ANN. § 2307.382 (2005) (emphasis added).

Up until about 10 years ago, Ohio courts had generally construed section 2307.382(A) as extending personal jurisdiction to the constitutional limits set by the Due Process Clause. *See General Acquisition, Inc. v. GenCorp Inc.,* 766 F. Supp. 1460, 1485 (S.D. Ohio 1990). But in 1994 the Ohio Supreme Court ruled that Ohio's long-arm statute does not reach to the level of constitutional due process. *Goldstein v. Christiansen,* 638 N.E.2d 541 n.1 (Ohio 1994).

Moreover, Ohio's legislature decided to amend their long-arm statute to include 2307.382(C), which restates the jurisdictional requirement that a cause of action must arise from a defendant's acts in the State. This amendment further emphasized the limited nature of Ohio's jurisdiction. Consequently, although by no means unequivocally stated, Ohio courts appear to construe their long-arm statute as authorizing a court to exercise personal jurisdiction over a non-resident defendant only when a cause of action arises from the non-resident defendant's transacting any business in Ohio (or completion of one of the other acts enumerated in Section 2307.382(A)). *See Corporate Partners, L.P. v. National Westminster Bank PLC,* 710 N.E.2d 1144, 1147 (Ohio 1998). While Ohio leaves unclear what "arises from" means, their legislature undoubtedly desired *some* limiting effect as to the reach of Ohio's jurisdiction. In contrast, the purpose of similar language in our long-arm

statute is less certain.

## Michigan

Michigan's long-arm statute states in pertinent part:

> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative *arising out of* an act which creates any of the following relationships: (1) The transaction of any business within the state . . . .

MICH. COMP. LAWS ANN. § 600.705 (2005) [emphasis added].

Despite the "arising out of" language found above, Michigan courts have long interpreted Section 600.705 as granting the broadest possible basis for jurisdiction consistent with due process. In *Sifers v. Horen,* the court noted that long-arm statutes in other states which confer limited personal jurisdiction based on "the transaction of any business within the state" have generally been construed to extend the state's jurisdiction to the farthest limits permitted by due process. 188 N.W.2d 623, 623-24 (Mich. 1971). Accordingly, the *Sifers* court gave the same expansive application to the Michigan long-arm statute. *Id.; see also Hill v. Smith,* 337 F. Supp. 981 (W.D. Mich. 1972) (Michigan long-arm statute reaches to full limits allowed under United States Constitution); *United States v.*

*Ivey,* 747 F.Supp. 1235, 1238 (E.D. Mich. 1990) (application of Michigan's long-arm statute extends to outer limits of due process).

Unlike other jurisdictions, however, Michigan's legislature never enacted a catch-all provision into their long-arm statute that explicitly gave Michigan personal jurisdiction to the extent permitted by due process. Rather, the decision to authorize jurisdiction up to the limits of the Constitution remains a product of judicial discretion. For reasons unclear, Michigan's legislature has found it unnecessary to resolve any perceived discrepancy between the "arising out of" language found in their long-arm statute and the holding in *Sifers* that the statute permits general jurisdiction consistent with the Constitution.

*New York*

New York's long-arm statute reads as follows:

> (a) Acts which are the basis of jurisdiction. As to a cause of action *arising from* any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state . . .

N.Y.C.P.L.R. 302 (2005) (emphasis added).

Unlike jurisdictions whose courts gloss over the "arising out of" language found in their long-arm statute (e.g., Michigan), or whose legislatures amend the statute to clarify the reach of their courts' jurisdiction (e.g., Illinois and Ohio), New York employs a judicially crafted test to determine when jurisdiction is appropriate. Under this so-called "substantial nexus" test, there must be a substantial relationship or nexus between the business transacted (or other activities enumerated in the statute) in New York and the cause of action. *See Johnson v. Ward*, 829 N.E.2d 1201, 1202 (N.Y. 2005) (citation omitted). A substantial relationship is shown where an action is sufficiently related to the in-state transaction such that it would not be unfair to deem it to arise out of the transaction. *See Newbro v. Freed*, 337 F.Supp.2d 428 (S.D.N.Y. 2004); *see also Talbot v. Johnson Newspaper Corp.*, 522 N.E.2d 1027 (N.Y. 1998) (defendant must have been involved in "purposeful activities" in New York which were "substantial[ly] relat[ed]" to the suit).

Thus, while still not reaching to the limits of constitutional due process, the "substantial nexus" test allows New York to extend its jurisdiction to situations where a party has "contacts" with the state, but where the causes of action do not clearly arise out of those contacts. Indeed, New York has continually upheld long-arm jurisdiction over a nondomiciliary where the claim had the requisite nexus to an in-state transaction, even if the claim did not "arise from" that transaction. *See e.g., George Reiner & Co. v. Schwartz*, 363 N.E.2d 551, 554 (N.Y. 1977) (concluding there was jurisdiction over a Massachusetts resident for breach of an employment contract entered into in New York); *Singer v. Walker*, 209 N.E.2d 68 (N.Y. 1965) (sustaining jurisdiction because plaintiff's personal injury claim resulting from the use of a defective hammer arose from "the purposeful activities engaged in by [defendant]" in New York "in connection with the sale of its products in the New York market").

On the other hand, New York courts have also held that jurisdiction is not justified where the relationship between the claim and the transaction is too attenuated. *See e.g., Talbot*, 522 N.E.2d at 1027 (holding that the nexus between a coach's defamation action and a former student's pursuit of a college degree in new York was insufficient to support jurisdiction); *Ward*, 829 N.E.2d at 1203 (concluding that there was not a sufficient nexus between defendant's possession of a New York driver's license and vehicle registration and defendant's allegedly negligent driving in New Jersey to sustain jurisdiction).

*iv. Conclusion*

■ We would feel obliged to construe A.S.C.A. § 3.0103(b) literally if it clearly expressed the Legislature's intent. But given the length of time that has passed since its enactment, the absence of legislative amendment, and the ambiguity surrounding the meaning of "arising out of" in comparable long-arm statutes in other jurisdictions, we find it reasonable to interpret § 3.0103(b) as permitting jurisdiction beyond the specific jurisdiction suggested by Ford. In following the majority of jurisdictions who either have amended their long-arm statutes to include a catch-all provision, or who have read into the statute such an interpretation, we conclude that the "arising out of" language in § 3.0103(b) should not be read to severely limit this Court's jurisdictional reach.

However, we also cannot completely disregard the statute's plain word meaning. Thus, while we find our long-arm statute to confer more than specific jurisdiction over non-residents, we do not see fit to stretch our jurisdiction to the outer limits of constitutional due process. Instead, adopting the philosophy of the New York courts and their substantial nexus analysis, we read § 3.0103(b) as requiring a substantial relationship between a defendant's actions in American Samoa and a plaintiff's cause of action in order to satisfy the "arising out of" or "nexus" requirement of the statute. We find this interpretation to be the most sensible construction of our long-arm statute, and we believe it falls within the reasonable implications of Section 3.0103(b)'s language.[7]

■ As a result, in order for us to confer jurisdiction upon Ford under the territory's long-arm statute, an articulable nexus between the business transacted by Ford and Lefiti's cause of action must be established. We

---

[7] Of course, such an inquiry would become wholly unnecessary were the Legislature to amend our long-arm statute to include a catch-all provision that grants to this Court jurisdiction over all matters in which the territory may constitutionally assert jurisdiction.

find that there is a sufficient nexus to support jurisdiction over Ford. Lefiti's causes of action—which resulted from use of a defective Ford truck purchased in Hawaii—can be said to arise from Ford's purposeful activities in this territory; to wit, the benefits derived from selling its vehicles in the American Samoa market.

By virtue of Ford selling vehicles to Samoa Motors, Samoa Motors' assertion that it is an "authorized Ford dealer," and Ford's own promotion of Samoa Motors on its website, it is not unfair to Ford to deem Lefiti's causes of action to arise out of the Ford's transacted business in the territory. The relationship between Lefiti's causes of action and Ford's purposeful and continual presence in the territory is not so attenuated as to make this Court's exercise of personal jurisdiction over Ford improper. Thus, we hold that jurisdiction over Ford is proper under A.S.C.A. § 3.0103(b).

B. Service of Process

■ Even though we find personal jurisdiction over Ford, we must still address Ford's claim that we improperly authorized service of process under A.S.C.A. § 30.0310. Section 30.0310 provides the following:

> If the agent required by paragraph 6 of 30.0302 cannot be found within American Samoa, service of process may be made upon the [foreign] corporation through the Treasurer of American Samoa by sending the original and 2 copies to him, and on the original of which he shall accept service on behalf of the corporation. He shall retain one copy for his files and send the other by registered mail to the corporation at the address of its home office as shown by the records in his office, which service shall have the same force and effect as if lawfully made upon the corporation.

A.S.C.A. § 30.0302(6) states:

> The application shall also contain a statement subscribed and sworn to by at least two of the principal officers of the corporation, setting forth the following: . . .
> (6) a certified copy of the resolution of the board of directors of the corporation giving the name and address in American Samoa of a resident agent on whom process directed to such corporation may be served.

Ford interprets § 30.0302(6) to limit service under § 30.0310 to situations where a resident agent of a foreign corporation already authorized to transact business in American Samoa cannot be found within the territory. Ford argues that it has never been licensed to transact business in the territory and that it has never set up a resident agent for service of process in American Samoa. Thus, according to Ford, substitute service of process upon Ford under § 30.0310 is not authorized under the statute.

We disagree. Section 30.0310's reference to § 30.0302(6) does not establish a foreign corporation's attainment of authorization to transact business in the territory, and the setting up of an agent of process in the territory, as prerequisites for service under § 30.0310. Although Section 30.0302 details the application requirements for foreign corporations wishing to transact business in American Samoa, and paragraph 6 of § 30.0302 is set within these requirements, failing to complete these requirements does not allow a foreign corporation to escape jurisdiction.

To rule otherwise would discourage foreign corporations from complying with A.S.C.A. § 30.0302 at all, as failure to meet these requirements would absolve them from possible suit in this court. This could not be what the Legislature intended in drafting this statute. As is the case here, if personal jurisdiction over a foreign corporation is found under A.S.C.A. § 3.0103(b), and its agent cannot be found in the territory, service of process under § 30.0302 is proper.

### Order

1. Because we find good cause to set aside the clerk's default, we grant Ford' motion to set aside default.

2. Because Ford's transacted business with American Samoa conforms with the territorial long-arm statute and due process considerations, we deny Ford's motion to dismiss for lack of personal jurisdiction. Also, because service of process under A.S.C.A. § 30.0310 was proper, we deny Ford's motion to dismiss for insufficient service.

It is so ordered.